Electronically Filed
7/20/2022 9:25 PM
Steven D. Grierson
CLERK OF THE COURT

**FAC**
ROBERT S. MELCIC
Nevada Bar No. 14923
3315 E. Russell Rd.
Ste. A4-271
Las Vegas, NV 89120
Phone: (702) 526-4235
Clerk: (725) 577-8013
Email: robertmelcic@gmail.com
*Attorney for Plaintiff Allanna Warren*

**DISTRICT COURT**

**CLARK COUNTY, NEVADA**

| | |
|---|---|
| ALLANNA WARREN,<br><br>Plaintiff,<br><br>vs.<br><br>SPARKS POLICE DEPARTMENT, a government entity; WASHOE COUNTY JAIL, a government entity; LAS VEGAS METROPOLITAN POLICE DEPARTMENT, a government entity; DOE GOVERNMENT ENTITIES 4 through 10; OFFICER DOE JONES, a Sparks Police Department Police Officer, in his individual and official capacities; OFFICER DOE PATTERSON, a Sparks Police Department Police Officer, in his individual and official capacities; OFFICER GINGER MILLER, a Sparks Police Department Police Officer, in her individual and official capacities; SPARKS POLICE OFFICER DOE 1, a Sparks Police Department Police | Case No.: A-22-852179-C<br><br>Dept. No.: 29<br><br>**FIRST AMENDED COMPLAINT** |

Officer, in his individual and official capacities;
DOE CORRECTIONS OFFICER(S) FOR WASHOE COUNTY JAIL, in their individual and official capacities; and DOE INDIVIDUALS 6 through 50 in their individual and official capacities.

Defendants.

COMES NOW Plaintiff, ALLANNA WARREN, by and through her counsel, Robert S. Melcic of The Law Office of Robert S. Melcic, and files her *First Amended Complaint* against SPARKS POLICE DEPARTMENT, WASHOE COUNTY JAIL, LAS VEGAS METROPOLITAN POLICE DEPARTMENT, DOE GOVERNMENT ENTITIES 4 through 10, SPARKS POLICE OFFICERS Doe JONES, Doe PATTERSON, GINGER MILLER, SPARKS POLICE OFFICER DOE 1, DOE CORRECTIONS OFFICER(S) FOR WASHOE COUNTY JAIL, and DOE INDIVIDUALS 6 through 50, all in their individual and official capacities, as follows.

## I.
## STATEMENT OF THE CASE

This case arises from the unlawful use of force and unlawful arrest on two dates: June 14, 2020 and June 20, 2020. On May 7, 2020, Ms. WARREN (hereinafter, “Ms. WARREN” or “PLAINTIFF”) was walking along a path on public land known as a “fire trail.” A man named Steven Saults and his wife were present on the trail. The couple were walking their two, large dogs who were off their leashes and running loose. The dogs came near to Ms. WARREN, who asked the Saults to leash them. Mr. Saults, Caucasian, began to scream racial epithets at Ms. WARREN, who is African-American, including by calling her “a fat nigger bitch.”

Afraid for her safety, Ms. WARREN pulled out her smartphone and began recording Mr. Saults yelling at her. Saults battered Ms. WARREN when he grabbed her arm and tried to slap her phone out of her hand. Thereupon, Ms. WARREN sprayed Mr. Saults with pepper spray in an attempt to get him to stop attacking her physically. For reasons either having to do with the power on her phone or with the phone's ability to data transfer, these videos that Ms. WARREN took are presently without audio, but Plaintiff is working to recover her evidence.

Ms. WARREN was successfully able to get the Saults cited by Washoe County Regional Animal Services for not leashing and not vaccinating their dogs. She also attempted to file a police report against Mr. Saults on May 7, 2020 and received a police report back on June 3, 2020. There is also body cam footage extant of the SPARKS POLICE DEPARTMENT going to the Saults' house to inquire about the incident. There, the white police officers are extremely deferential to Mr. Saults' version of events and at no point cite him for battery or a hate crime. Ms. WARREN again encountered the Saults and their unleashed dogs on the same fire trail on May 29, 2020.

Following the May incidents with the dogs, on Sunday, June 14, 2020, two SPARKS POLICE officers named PATTERSON and JONES detained Ms. WARREN while she was walking in her neighborhood. The officers pulled their police truck up to block her from walking. Ms. WARREN initially sat on the sidewalk of her own volition. But eventually, OFFICER PATTERSON yelled at Ms. WARREN to remain seated on the hot concrete sidewalk in weather that was then approximately 80 degrees with scattered cloud cover.[1] Ms. WARREN was wearing shorts.

OFFICER PATTERSON alternatively offered for Ms. WARREN to sit on

[1] For the approximate weather in Sparks, Nevada, on this day, please see: https://www.timeanddate.com/weather/@5512862/historic?month=6&year=2020.

the hot, metal front bumper of the police truck. During the course of being seated near the police truck, Ms. WARREN was exposed to exhaust fumes emanating from underneath the police truck. Ms. WARREN sat on the hot concrete for about 10 minutes. When she tried to arise, OFFICER PATTERSON yelled at her to sit back down.

OFFICERS PATTERSON opined that he needed Ms. WARREN to sit because she was was mentally "unstable." Ms. WARREN had used pepper spray to defend herself from a battery and hate crime by Steven Saults and his two large, unleashed, and unvaccinated dogs.

For this, she was now deemed "unstable" by SPARKS POLICE DEPARTMENT. Because WARREN was walking casually around her neighborhood, she did not have ID on her at the time. The police harassed her for not having ID. All of this is captured on both body cam videos taken by SPARKS POLICE DEPARTMENT and a video taken by Ms. WARREN herself.

OFFICERS PATTERSON and JONES intimated that they planned to arrest Ms. WARREN for not having ID and for not declaring to them what she was doing. OFFICER JONES then stated, "I explained to you, we're investigating a potential battery that occurred a few weeks ago between you and a gentleman on this hill over here. And he said he saw you today and he was advised if he saw you to call back so we could come and ID you and talk to you and just get your side of the story. That's all."

Thus, OFFICERS PATTERSON and JONES viewed PLAINTIFF'S racist batterer, an old, white man, as a "gentleman." The OFFICERS were also essentially saying that Ms. WARREN was trespassing by walking in her own neighborhood.

OFFICERS PATTERSON and JONES expressed only limited interest in whatever police report Ms. WARREN had filed about the Saults. OFFICER

JONES looked up the police reports but concluded that WARREN had not been battered, so there was nothing to investigate. On June 14, 2020, SPARKS POLICE DEPARTMENT eventually allowed Ms. WARREN to leave.

But then, on Saturday, June 20, 2020, Ms. WARREN was officially arrested by SPARKS POLICE DEPARTMENT for first degree misdemeanor stalking of the Saults.

Ms. WARREN had had no interaction with the Saults apart from the two incidents in May: The first, on May 7, when Mr. Saults battered Ms. WARREN and screamed racial epithets at her and she videotaped and pepper-sprayed him for her own safety; and the second, on May 29, when Ms. WARREN again encountered the Saults and their unleashed dogs on the fire trail, after which point, Ms. WARREN reported the Saults to Washoe County Regional Animal Services and the Saults were cited.

The arresting officers on June 20, 2020, a female officer named GINGER MILLER and an unknown male officer referred to herein as "SPARKS POLICE OFFICER DOE 1," walked Ms. WARREN down the length of her entire apartment complex, The Villas at d'Andrea Apartments in Sparks, before taking her in. By this point, the police had already gone to various neighbors in the apartment complex to inquire and warn about Ms. WARREN.

GINGER MILLER twisted Ms. WARREN's arm and would not let her record the incident. When Ms. WARREN asked why she was being arrested, OFFICER MILLER stated, in Ms. WARREN'S recollection, "for taking pictures and that guy with the dogs is afraid of you."

It is difficult to know everything that OFFICER GINGER MILLER said to Ms. WARREN on June 20, 2020, because her body cam footage appears to be missing and has not been released to PLAINTIFF despite requests, nor was it released to PLAINTIFF'S counsel along with the other body cam videos that

SPARKS POLICE DEPARTMENT has released to PLAINTIFF'S counsel.

OFFICER MILLER smashed food that Ms. WARREN had purchased for her mother. To date, SPARKS POLICE still will not release footage from Officer MILLER's body cam. OFFICER MILLER's partner officer, SPARKS POLICE OFFICER DOE 1, cut off the sound and video to his body cam footage on multiple occasions.

Ms. WARREN had no criminal record at the time of her arrest and should have been released on her own recognizance. Regardless of this, Ms. WARREN languished in WASHOE COUNTY JAIL for a week, from June 20, 2020 to June 26, 2020. During this *entire* time, she was placed in solitary confinement for no reason.

By "solitary confinement," PLAINTIFF means that she was in a small, separate place within WASHOE COUNTY JAIL, completely alone, and that this place only had room for one person. Ms. WARREN languished in this small space for six solid days. She was given no reason for her segregation from the main jail population.

When Ms. WARREN was released from WASHOE COUNTY JAIL, her car—which was legally parked on a side street near to her apartment building prior to her arrest—mysteriously had a tow sticker placed upon it for no reason. The date on the tow sticker was June 23, 2020 and the responding officer was badge number 432.

The charges against Ms. WARREN were entirely dropped on September 15, 2021 because SPARKS POLICE made a deal with Ms. WARREN'S defense attorney at the time, Richard Davies, that if she waited a year to go to court, the charges against her would be dropped. Ms. WARREN did not realize at the time and was not informed by criminal defense attorney Davies that this delay of a year cut into her statute of limitations for timely filing a civil matter against SPARKS

POLICE DEPARTMENT.

Ms. WARREN and her elderly mother had to move from the Villas at d'Andrea apartment complex in Sparks to another area of Reno because of ongoing harassment at the old apartment complex following Ms. WARREN'S arrest. The move cost Ms. WARREN significant moving expenses. Eventually, Ms. WARREN and her mother had to leave Reno altogether due to ongoing harassment at the new apartment building. The WARRENS moved to Las Vegas to escape being harassed by SPARKS POLICE DEPARTMENT.

Washoe County had a motive for disliking Ms. WARREN. From August 5, 2019 to September 24, 2019, WARREN had actually worked for Washoe County in their Alternative Sentencing Department. In that capacity, she worked in a makeshift crime lab near to the county courthouse. There, she was expected to analyze evidence chemically despite having no formal scientific training. Ms. WARREN'S hiring for the lab was rushed and did not meet typical employment protocols.

In the lab, which was not properly licensed, Ms. WARREN regularly worked with caustic chemicals but was given no personal protective equipment (PPE) to perform her work. The lab had no eye wash station, no labels for chemicals, and no hazardous waste disposal. Without hazardous waste disposal, corrosive chemicals were being left in the trash where they could leach into the water system outside.

On September 23, 2019, Ms. WARREN went to the hospital with contact dermatitis acquired as a direct result of her unsafe employment. The next day, she complained to the Occupational Safety and Health Administration (OSHA) about the conditions in the lab and gave her supervisor a doctor's note.

Ms. WARREN was fired by Washoe County at around 6 PM on Tuesday, September 24, 2019. When Nevada OSHA investigated Washoe County, the

County was fined upwards of $4,000 for facilities violations as a direct result of Ms. WARREN's complaint regarding unsafe working conditions.

Prior to working for the Alternative Sentencing Department of Washoe County, Ms. WARREN worked as an administrative assistant at China Spring Youth Camp in Douglas County. In this capacity, Ms. WARREN observed that the camp was doctoring their accounting files and was prescribing psychotropic medication to children under 18 in exchange for Medicaid subsidies.

Rather than go along with these financial malfeasance schemes as her supervisor expected her to, Ms. WARREN reported what she saw to the state and was subsequently fired. Ms. WARREN had worked at the camp for eleven months and one week and was fired right before her probationary period was over.

A Northern Nevada judge had a son who was incarcerated at the camp. This judge was friends with another judge who oversaw the camp. When Ms. WARREN was hired by Washoe County, the judge overseeing the Alternative Sentencing Department was the same judge whose son had once been incarcerated at China Spring at the time when Ms. WARREN brought her concerns about the juvenile facility to state regulators.

In June of 2021, China Spring Youth Camp temporarily closed the half of its camp dedicated to the care of boys due to, among other problems, "financial instability."[2]

But the problems for Ms. WARREN did not stop in Washoe County. In November 2021, during a training course for her new job in Las Vegas, a co-worker teased Ms. WARREN by showing her a copy of her booking photo that had been

---

[2] "China Springs Youth Camp for boys closes due to staffing and financial instability." June 10, 2021. SOUTHTAHOENOW.COM. Available online at: http://southtahoenow.com/story/06/10/2021/china-springs-youth-camp-boys-closes-due-staffing-and-financial-instability.

taken by the SPARKS POLICE DEPARTMENT when she was arrested.

Ms. WARREN suffers from alopecia. When she was booked by the police in Sparks on June 20, 2020, OFFICER MILLER removed Ms. WARREN'S hat before her booking photo was taken, so Ms. WARREN appears bald in the photo. Somehow, Ms. WARREN's co-worker got his hand on this photo, and stated that he had actually gotten the photo from their training instructor. Thereupon, Ms. WARREN's classmates in the training program teased her with photos of bald people and the instructor harassed her also.

The booking photo cannot be found online. Ms. WARREN called the Washoe County Sherriff's Office, who stated to her that such a photo is only a public record when an individual is incarcerated, but that after incarceration is over, the photo is removed from their website. The Washoe County Sherriff's office additionally stated that the only way the picture could be released at this point would be either at Ms. WARREN's own request for it, or, in response to a request from someone inside SPARKS POLICE DEPARTMENT.

Therefore, on information and belief, SPARKS POLICE DEPARTMENT impermissibly released Ms. WARREN'S booking photo online or to her then-current employer in Las Vegas in an effort to harass, embarrass, stalk, and belittle her. After PLAINTIFF complained about the arrest photo to her employer, she was placed on administrative leave and ultimately fired.

It is also possible that LAS VEGAS METROPOLITAN POLICE DEPARTMENT additionally had a hand in the booking photo getting released to Ms. WARREN'S new employer in Las Vegas. Ms. WARREN has been the victim of a wide variety of suspicious behavior at the hands of LAS VEGAS METROPOLITAN POLICE DEPARTMENT since having moved from Reno to Las Vegas in July 2021.

For instance, first, her property was transported south in the state by U-Haul,

who lost the property, who admitted that the lost property had been confiscated by "local employees in both cities [who] were actively working with the police in each city," meaning, SPARKS POLICE DEPARTMENT and LAS VEGAS METROPOLITAN POLICE DEPARTMENT working in tandem. U-Haul eventually paid Ms. WARREN a settlement of $5,000 after her late-delivered property was finally recovered.

Second, somehow, LAS VEGAS METROPOLITAN POLICE DEPARTMENT became aware of the Airbnb where Ms. WARREN and her mother were staying in Las Vegas prior to moving into permanent lodgings in Las Vegas. LAS VEGAS METROPOLITAN POLICE DEPARTMENT cased the outside of Ms. WARREN'S Airbnb on two separate times on the same day. Ms. WARREN called LAS VEGAS METROPOLITAN POLICE DEPARTMENT to try to determine why they were coming to her new Airbnb. LAS VEGAS METROPOLITAN POLICE DEPARTMENT stated that they could not give out any information related to an "ongoing investigation until that person gets arrested."

Third, Ms. WARREN regularly finds herself followed by both uniformed and plain clothes LAS VEGAS METROPOLITAN POLICE DEPARTMENT officers when she leaves her apartment building by car. She cannot take videos of this behavior when she is alone in her car for fear of being pulled over for using a cell phone while driving. Ms. WARREN'S mother is elderly and disabled and also cannot take videos of this behavior on the rare occasions when she is in the car alongside her daughter.

Fourth, Ms. WARREN'S internet connection has been intercepted by, on information and belief, LAS VEGAS METROPOLITAN POLICE DEPARTMENT. Since February of 2022, Ms. WARREN has not been charged anything for her internet connection that also provides WiFi to her apartment.

Curiously, however, her internet service is working to this day and has never been shut off.

When Ms. WARREN e-mailed her internet service provider, T-Mobile, about how the internet was being paid, she received an out-of-office reply. When she called T-Mobile, Ms. WARREN was told that her internet "was paid by a police account" and then the line went dead. Ms. WARREN has not changed providers because, in her experience, this accomplishes nothing. SPARKS POLICE DEPARTMENT and LAS VEGAS METROPOLITAN POLICE DEPARTMENT, working in tandem, simply follow her to her new provider.

To date, the property managers at Ms. WARREN'S apartment building have used videos "skimmed" from Ms. WARREN'S *own* surveillance cameras operating on Ms. WARREN'S *own* WiFi connection to attempt to prosecute Ms. WARREN for alleged violations of community standards. To that end, LAS VEGAS METROPOLITAN POLICE DEPARTMENT has banged on Ms. WARREN'S door at least twice, allegedly at the behest of a neighbor.

Without further discovery, it is difficult for PLAINTIFF to know the full extent of the surveillance against her and how it continues to be obtained, but PLAINTIFF believes that there is cooperation between SPARKS POLICE DEPARTMENT and LAS VEGAS METROPOLITAN POLICE DEPARTMENT.

Prior to her ordeal, Ms. WARREN suffered from anxiety, depression, and alopecia. Now, subsequent to her ordeal at the hands of SPARKS POLICE DEPARTMENT and LAS VEGAS METROPOLITAN POLICE DEPARTMENT, PLAINTIFF additionally suffers from PTSD and paranoia. Following her confinement, and likely due to stress and the filthy conditions inside the WASHOE COUNTY JAIL, Ms. WARREN developed hidradenitis suppurativa, a painful skin condition that causes small, painful lumps to form under her skin. Following her jailing, MS. WARREN developed these sores and pustules all over her body, for

which she sought the help of a dermatologist.

## II.
## JURISDICTION AND VENUE

1. "A court of this state may exercise jurisdiction over a party to a civil action on any basis not inconsistent with the Constitution of this state or the Constitution of the United States." NRS 14.065.
2. Jurisdiction in this Court is proper because this is a complaint seeking monetary relief in excess of $10,000, the PLAINTIFF is a resident citizen of Nevada, and the DEFENDANTS SPARKS POLICE DEPARTMENT, WASHOE COUNTY JAIL, and LAS VEGAS METROPOLITAN POLICE DEPARTMENT are governmental entities paid for by the City of Sparks, County of Washoe, City of Las Vegas, and County of Clark, respectively.
3. Venue is proper in the Eighth Judicial District Court of Clark County because:
    a. Under NRS 13.020, "Actions for the following causes must be tried in the county where the cause, or some part thereof, arose, subject to the power of the court to change the place of trial." A substantial part of the events and omissions giving rise to this claim have occurred and keep occurring within Clark County;
    b. Under NRS 13.050(2)(b), one factor to consider in questions of venue is "When there is reason to believe that an impartial proceeding cannot be had therein." PLAINTIFF and her elderly mother have relocated to Las Vegas out of a concern for their safety and civil rights were they to stay in the Reno area. Further, the Sparks City Attorney's office is run by a former prosecutor. Given all the factors in this situation—including how defense counsel in Reno mishandled her case—PLAINTIFF does not believe that she can obtain a fair hearing in the Reno courts;

c. The PLAINTIFF currently resides in Las Vegas, Nevada, where a substantial part of the events or omissions giving rise to the claims of this case occurred.

## III.
## PARTIES

4. At all times relevant to this action, PLAINTIFF was a resident of the State of Nevada, County of Washoe, and then, County of Clark.
5. On information and belief, DEFENDANT SPARKS POLICE DEPARTMENT is a governmental agency situated in Washoe County, Nevada.
6. On information and belief, DEFENDANT WASHOE COUNTY JAIL is a governmental agency situated in Washoe County, Nevada.
7. On information and belief, DEFENDANT LAS VEGAS METROPOLITAN POLICE DEPARTMENT is a governmental agency situated in Clark County, Nevada.
8. On information and belief, DEFENDANT Doe JONES is a police officer for the City of Sparks and resides in Washoe County, Nevada.
9. On information and belief, DEFENDANT Doe PATTERSON is a police officer for the City of Sparks and resides in Washoe County, Nevada.
10. On information and belief, DEFENDANT GINGER MILLER is a police officer for the City of Sparks and resides in Washoe County, Nevada.
11. On information and belief, DEFENDANT SPARKS POLICE OFFICER DOE 1, Miller’s partner on June 20, 2020, is a police officer for the City of Sparks and resides in Washoe County, Nevada.
12. On information and belief, DEFENDANT DOE CORRECTIONS OFFICER(S) FOR WASHOE COUNTY JAIL are Washoe County employees and reside in Washoe County, Nevada.

13. On information and belief, the true names, capacities, and specific involvement of the DEFENDANTS sued herein as DOE GOVERNMENT ENTITIES 4 through 10 and DOE INDIVIDUALS 6 through 50 are unknown to PLAINTIFF, who sues these DEFENDANTS by such fictitious names; PLAINTIFF alleges that each of the DEFENDANTS sued herein as DOEs performed acts and are responsible in some manner for the events and injuries alleged herein.

## IV.
## GENERAL ALLEGATIONS COMMON TO ALL CLAIMS

14. PLAINTIFF is a forty-four year old African-American woman.
15. PLAINTIFF suffers from pre-existing alopecia, depression, and anxiety; as a result of her ordeal at the hands of SPARKS POLICE DEPARTMENT and LAS VEGAS METROPOLITAN POLICE DEPARTMENT, she now also suffers from hidradenitis suppurativa, PTSD, and paranoia.
16. PLAINTIFF has been a resident of the state of Nevada throughout the entirety of this ordeal.
17. In July 2021, PLAINTIFF and her elderly mother moved to Las Vegas from Reno due to her fear of retribution by DEFENDANT SPARKS POLICE DEPARTMENT.
18. Since her move, PLAINTIFF has been subject to ongoing surveillance and interference in Las Vegas by LAS VEGAS METROPOLITAN POLICE DEPARTMENT, detailed *infra*.
19. On March 18, 2019, PLAINTIFF was fired by Douglas County China Spring Youth Camp after she made a complaint about financial malfeasance and regulatory violations there.
20. PLAINTIFF had worked at the camp for eleven months and one week and was

fired right before her probationary period was over.

21. Douglas County eventually temporarily closed the portion of the camp for boys due to “financial instability.”
22. On September 24, 2019, PLAINTIFF was fired by the Washoe County court system after she made a complaint about unsafe working conditions there.
23. Washoe County was ultimately fined approximately $4,000 because of PLAINTIFF’S complaints to OSHA regarding the unsafe working conditions.
24. Less than eight months later, on Thursday, May 7, 2020, PLAINTIFF was walking on public land known as a “fire trail” in an area near to her apartment building.
25. PLAINTIFF then noticed two dogs running loose on the land, not wearing leashes, and accompanied by a Caucasian couple now known to be Steven and Alana Saults.
26. The dogs were coming closer to PLAINTIFF, who asked for them to be leashed.
27. Steven Saults screamed racial epithets at PLAINTIFF including by calling her “a fat nigger bitch.”
28. PLAINTIFF began recording Mr. Saults and his dogs; these recordings are presently without audio for the reasons stated *supra*.
29. Upon realizing that he was being recorded, Mr. Saults battered the PLAINTIFF by grabbing PLAINTIFF’S arm and attempting to slap PLAINTIFF’S phone out of her hand.
30. PLAINTIFF pepper-sprayed Steven Saults to get him to stop attacking her physically.
31. Following this incident, PLAINTIFF tried to file reports about it; first, she filed a report on May 7, 2020 with Nevada State Representative Skip Daly; then she filed a report with Sparks Mayor Ron Smith on May 8, 2020.

32. PLAINTIFF also shared e-mails back and forth with other Northern Nevada Representatives such as Jill Dickman.
33. On May 9, 2020, PLAINTIFF received a response from Mayor Smith that he had forwarded her concerns to his police chief.
34. On June 3, 2020, PLAINTIFF finally received a written police report back with a case number from Sparks Police; the report number is 20-3870 and the reporting officer was "C. Fleiner," badge number 242.
35. Almost everything on this police report is typed except for the date on the first page, which was whited out and written in as "5/7/20."
36. Bodycam footage subsequently obtained shows that, subsequent to the incident on the fire trail, SPARKS POLICE DEPARTMENT went to the Saults' home to investigate where they were highly deferential to Mr. Saults, viewed him as the victim, and did nothing to cite him for the battery of PLAINTIFF or for a hate crime against PLAINTIFF.
37. This deference to Saults is further confirmed by videos released by DEFENDANT SPARKS POLICE DEPARTMENT to PLAINTIFF'S counsel, in which OFFICERS JONES and PATTERSON regularly call Saults a "gentleman"—even after he had battered PLAINTIFF and had referred to her as a "fat nigger bitch" as the justification for his battery of PLAINTIFF.
38. On May 29, 2020, PLAINTIFF was again on the fire trail and again encountered the Saults on the trail with their dogs unleased; PLAINTIFF took pictures of this and reported the Saults to Regional Animal Services for Washoe County; PLAINTIFF stated her concerns to Animal Services that she was being stalked by the Saults.
39. On May 30, 2020, the Saults were cited by Washoe County Regional Animal Services for not leashing and not vaccinating their dogs.
40. On Sunday, June 14, 2020, PLAINTIFF was walking in her neighborhood; this

was a casual walk, so PLAINTIFF was not carrying a purse with ID in it.

41. Two police officers now known to PLAINTIFF as OFFICERS PATTERSON and JONES pulled up in their police truck and blocked PLAINTIFF from continuing forward on her intended path of travel.

42. This incident is documented on videos from at least four different perspectives: OFFICER PATTERSON's body cam video, OFFICER JONES's body cam video, the stationary dash cam video, and video that PLAINTIFF herself took on her smartphone. The following exchange is compiled from all four sources:

43. While getting out of the police truck, OFFICER PATTERSON states to PLAINTIFF ironically, "Don't get your pepper spray out," a statement that indicates that, right from the start of this confrontation, SPARKS POLICE officers viewed PLAINTIFF as the aggressor.

44. When confronted by the officers, PLAINTIFF gets out her phone to record.

45. On video, OFFICER JONES states, "This is the same circumstance as the other one. Everything has to be recorded."

46. Then, OFFICER JONES states, "Just so you know that we're both recording right now."

47. Then, OFFICER PATTERSON asks, "Alright, what's going on today?"

48. PLAINTIFF invokes her 5th Amendment rights by remaining silent.

49. OFFICER JONES presses, "Can you answer our questions, please?"

50. OFFICER PATTERSON presses, "Can you record and talk at the same time?"

51. At this point, PLAINTIFF sits down on the concrete sidewalk of her own volition.

52. Then, both OFFICERS ask PLAINTIFF for photo ID.

53. PLAINTIFF asks, "I have a right to remain silent, right?"

54. OFFICER PATTERSON states, "Well, you're required to identify yourself. You don't have to answer any of our questions, but you need to identify

yourself."

55. OFFICER JONES starts to say, "The reason we're talking to you is remember," at which point, PLAINTIFF cuts him off and asks, "Am I being detained?"

56. Both OFFICERS answer in the affirmative.

57. PLAINTIFF asks, "For what crime?"

58. OFFICER JONES states, "I'm trying to explain. You remember a few weeks ago, um, an incident took place up the hill back here between you and a gentleman who lives around here who was walking with his wife and a dog? Maybe something about pepper spray involved? Remember that?"

59. At this point, PLAINTIFF remains silent.

60. OFFICER PATTERSON asks condescendingly, "Do you remember that?"

61. OFFICER PATTERSON, losing patience with PLAINTIFF'S choice to remain silent, then states, "Okay, do you have an identification on you, ma'am, or not?"

62. PLAINTIFF asks OFFICER JONES, "What am I being detained for?"

63. JONES replies, "I just explained to you—" whereupon OFFICER PATTERSON cuts him off and asks, "What's your last name, ma'am?"

64. PLAINTIFF is confused and says, "Well—, well—, I'm sorry—, Can I—, Can I—" whereupon OFFICER JONES cuts her off and says, "I explained to you, we're investigating a potential battery that occurred a few weeks ago between you and a gentleman on this hill over here. And he said he saw you today and he was advised if he saw you to call back so we could come and ID you and talk to you and just get your side of the story. That's all."

65. Notably, according to other body cam video related to this incident, when SPARKS POLICE DEPARTMENT went to the Saults' home to "get his side of the story," they did not in any way detain Mr. Saults.

66. In fact, SPARKS POLICE spoke in a very friendly manner in the driveway of Mr. Saults, during which entire time, Saults was allowed to remain standing and

was never treated like a criminal suspect.

67. Conversely, PLAINTIFF was treated like a criminal suspect from the very start of her interactions with officers working for SPARKS POLICE DEPARTMENT—even though she was the true victim of the battery.

68. At this point, PLAINTIFF states, “Well, I would like an attorney.”

69. To which OFFICER PATTERSON replies, “So, what’s your last name?

70. PLAINTIFF chooses to remain silent.

71. OFFICER JONES states, “You’re not under arrest for anything at this point.”

72. PLAINTIFF states, “Okay, well, I don’t understand the crime that I’m being detained for.”

73. OFFICER JONES states, “I just told you. I’m investigating a battery that took few, that took place a few weeks ago.”

74. OFFICER PATTERSON then states, “Ma’am, listen, I’m fine if you want to, like, exercise your rights and things like that, okay, but now, at this point, you’re delaying us, so you identify yourself, or I’m just going to arrest you and we’re going to take you to jail. Okay? It’s that simple.”

75. This statement by OFFICER PATTERSON threatening arrest would appear to contradict OFFICER JONES’ prior statement that “[W]e could come and ID you and talk to you and just get your side of the story. That’s all.”

76. PLAINTIFF keeps trying to inquire regarding the reason for her detainment to which OFFICER PATTERSON replies, “We already explained it. Multiple times. So here’s your opportunity to give me your last name or we will take you to jail. Do you understand?”

77. PLAINTIFF says “Yes,” but keeps speaking, whereupon OFFICER PATTERSON cuts her off by stating, “Okay, what is your last name?”

78. PLAINTIFF replies, “Warren.”

79. OFFICER PATTERSON says “Spell it.”

80. PLAINTIFF replies, "W-A-R-R-E-N."
81. OFFICER PATTERSON says, "First name."
82. PLAINTIFF replies, "Allanna."
83. To which OFFICER PATTERSON asks, "What?"
84. PLAINTIFF repeats, "Allanna."
85. OFFICER PATTERSON says, "Spell it."
86. PLAINTIFF replies, "A-L-L-A-N-N-A."
87. Then OFFICER PATTERSON asks for Ms. WARREN'S date of birth, clearly treating her like a criminal suspect.
88. PLAINTIFF replies, "10.21.77."
89. OFFICER JONES then says, "Thank you."
90. OFFICER PATTERSON asks, "Is your ID out of Nevada?"
91. PLAINTIFF asks, "I'm sorry?"
92. OFFICER PATTERSON replies condescendingly, "Is your identification out of Nevada?"
93. PLAINTIFF then asks, "Is Nevada a stop-and-ID state?"
94. OFFICER PATTERSON then says, "Ma'am, the identification that you had issued, is it out of Nevada?"
95. PATTERSON is angry enough at this point that he speaks over his colleague OFFICER JONES, who is also trying to answer PLAINTIFF'S question by stating, "This is how, this is how we try to determine who you are."
96. PLAINTIFF says, "No, I'm just asking, is this a stop-and-ID state?"
97. OFFICERS PATTERSON and JONES harassed PLAINTIFF for not having ID with her even though carrying ID is only required when someone is driving and it is common for women walking around their neighborhoods casually not to carry a purse or wallet.
98. At this point, OFFICER JONES pontificates on the legal concept of reasonable

suspicion, a pontification that would seem to contradict his prior statement that SPARKS POLICE DEPARTMENT was "just get[ting] your side of the story. That's all."

99. OFFICER JONES states, "What this is, is when we have reasonable suspicion, to believe that *you* have committed a crime, which we're investigating, the battery, *you* have to identify yourself in the state of Nevada." (Emphasis added.)

100. Thus, OFFICER JONES admits that, at this point in time, SPARKS POLICE DEPARTMENT viewed PLAINTIFF as the criminal suspect, despite the fact that Mr. Saults battered her.

101. OFFICER JONES states, "Does that make sense?"

102. PLAINTIFF asks, "Well, is this a stop and ID state is all I'm asking. Is Nevada a stop-and-ID state?"

103. OFFICER JONES states, "When we have reasonable suspicion that *you* have committed, are committing, or are about to committed [*sic*] a crime, *you* have to identify yourself in the state of Nevada." (Emphasis added.)

104. Again, OFFICER JONES is admitting that, at this point in time, SPARKS POLICE DEPARTMENT viewed PLAINTIFF as the criminal suspect, despite the fact that Mr. Saults battered her.

105. OFFICER JONES again asks, "Does that make sense?"

106. PLAINTIFF replies, "Okay, I get it."

107. OFFICER JONES, in an attempt to soften OFFICER PATTERSON'S more aggressive demeanor, explains, "So, what he was just asking is if you have an ID card like out of Nevada, out of California, that just helps us to determine who you are quicker so we can get you on your way.

108. PLAINTIFF replies, "Alright."

109. OFFICER JONES asks, "Do you live around here?"

110. PLAINTIFF then asks, "Do they know question [unintelligible], um, do you

know that, um, I asked to press charges against him, for the battery?"

111. OFFICER JONES states, "I . . . wasn't able to find you that day. I was looking for ya. Did you ever—Did you call the Police Department?"

112. PLAINTIFF states, "I—I—talked to Ron Smith who is the Mayor. Um, I've talked to—"

113. OFFICER JONES cuts her off, "But did you call, did you call the Police Department?"

114. PLAINTIFF replies, "I did. I sure did." PLAINTIFF chuckles because of how hard she worked to contact someone at SPARKS POLICE DEPARTMENT with virtually no official reply following her battery.

115. PLAINTIFF continues, "I said I wanted to press charges and I haven't heard anything and I have a case number and everything."

116. PLAINTIFF had finally received a police report back from SPARKS POLICE DEPARTMENT on or about June 3, 2020 after first attempting to file one in May.

117. OFFICER JONES interrupts PLAINTIFF and asks, "That day?"

118. OFFICER PATTERSON also interrupts. "That day, you called?" he asks.

119. OFFICER JONES asks, "After that happened, did you call us?"

120. PLAINTIFF replies, "I sure did."

121. OFFICER JONES then states somewhat under his breath, "You did not."

122. PLAINTIFF counters, "I have a case number."

123. OFFICER PATTERSON then asks, "What's your phone number?"

124. PLAINTIFF states, "Um, I don't answer questions. I can answer what my date of birth is."

125. Then, OFFICER PATTERSON interrupts her, stating, "Okay, well, you're, you're saying that we didn't respond?"

126. PLAINTIFF: "Yes."

127. OFFICER PATTERSON, "And you're saying that we didn't—"

128. PLAINTIFF interrupts, "I have the number!"

129. To which OFFICER PATTERSON replies, "Ma'am, listen to me. You're saying that you called and wanted to report the crime and press charges."

130. PLAINTIFF states, "Correct."

131. OFFICER PATTERSON states, "Okay, what phone number did you call on?"

132. PLAINTIFF replies, "Uh, whatever the SPARKS POLICE phone number is. I have a case number."

133. OFFICER PATTERSON says, "Go ahead."

134. OFFICER JONES asks "What's the case number?"

135. As PLAINTIFF searches on her phone in the bright sun, where it was difficult to see the phone screen, OFFICER JONES interjects, "'Cause that's part of us, right now, stopping out and talking to you today, is to get your side of the story and that. That makes sense?"

136. Again, when SPARKS POLICE DEPARTMENT went to Mr. Saults' home, they engaged in a very friendly conversation with him and his wife on their front driveway that was nothing like PLAINTIFF'S detainment in the hot sun on June 14, 2020, so OFFICER JONES' conclusion that SPARKS POLICE DEPARTMENT was merely "get[ting] [PLAINTIFF'S] side of the story" is questionable.

137. PLAINTIFF wasn't buying OFFICER JONES' dissembling, stating, "Uh, well, I need an attorney before I answer any more questions, but let me get the case number that I filed."

138. OFFICER JONES says, "Okay, then we'll, we'll look it up right now for you."

139. PLAINTIFF, "Okay, hold on."

140. OFFICER JONES says, “And see what’s going on with it.”

141. During this time, OFFICER PATTERSON speaks to Dispatch on his police radio regarding PLAINTIFF’S history because PLAINTIFF is considered by SPARKS POLICE DEPARTMENT to be a criminal suspect, wherein OFFICER PATTERSON mentions the phrase, “disturbing the peace.”

142. OFFICER PATTERSON asks Dispatch, “Do we show her as the victim of a battery or anything?”

143. Then, OFFICER PATTERSON asks Dispatch, “What address do we have for her?”

144. While PLAINTIFF is trying to see her phone screen to recover the case number, OFFICER JONES asks, “Any luck?”

145. Then, OFFICER PATTERSON asks, “Do you live on Craigmont Drive in Reno?”

146. PLAINTIFF replies, “Um, hold on just a second, let me get this, uh, number for you so just hold on a second.”

147. OFFICER PATTERSON continues, “Or are you still off 22 on North D’Andrea?”

148. PLAINTIFF states, “Uh, hold on, just a second, sir, let me just look for that number, okay? Thank you.”

149. OFFICER PATTERSON interrupts saying, “Okay” and OFFICER JONES also says, “Okay.”

150. OFFICER PATTERSON then adds, “Well, we don’t have anything in our system that I can tell, so far. Did you file it with Reno?”

151. PLAINTIFF states, “Okay, well, hold on just a second sir, just a second, okay? I don’t want any shootings today. Just a second, okay?”

152. OFFICER JONES says “Okay.”

153. OFFICER PATTERSON asks, "You don't want any shootings? What does that mean?"

154. PLAINTIFF replies, "Yeah, I don't want any shootings today."

155. OFFICER PATTERSON asks, condescendingly, "Okay, what is that supposed to mean?"

156. PLAINTIFF states, "Whatever you'd like it to mean, sir."

157. OFFICER PATTERSON asks, "Okay. Why would we shoot you?"

158. PLAINTIFF states, "You've got to ask all the dead Black folks that you guys have shot. So you've got to ask them."

159. OFFICER JONES says, condescendingly, "Well, we're trying to help you out right now."

160. Thus, according to OFFICER JONES' conclusion, he was "helping" PLAINTIFF by (this list is not exhaustive):

a. Keeping her detained on the hot sidewalk;
b. Speaking to her condescendingly about whether she had, in fact, filed a police report;
c. Referring to the man who had battered her as "a gentleman"; and
d. Threatening to arrest her for not identifying herself.

161. PLAINTIFF says, "Great. So let me get the case number if you don't mind."

162. OFFICER JONES says, "That's what we're waiting on."

163. PLAINTIFF says, "Thank you. Both you guys. Just wait."

164. At this point, OFFICER JONES walks back to the police truck and opens the passenger door. PLAINTIFF says, "Okay." OFFICER JONES asks PLAINTIFF "You got it?"

165. PLAINTIFF states, "Yeah."

166. OFFICER JONES states, "Let's see what you got."

167. At this point, PLAINTIFF rises from the curb to show her phone to OFFICER JONES, stating, “So, here. My phone is cracked, so. Alright, now this is from, you know Sheila?”

168. OFFICER JONES states “Can you turn up your brightness a little bit? It’s hard to see.”

169. PLAINTIFF replies, “I can’t hardly see it.”

170. OFFICER JONES states, “Yeah, it’s hard.”

171. PLAINTIFF says, “Uh, I don’t know how to turn it up, but, um, you see, I have, I have two cases here. It says, “Case has been taken.”

172. OFFICER JONES interjects, “Do you mind if I hold [your phone]? I can’t see.”

173. PLAINTIFF says, “I’m sorry. Here.” PLAINTIFF gives her phone to OFFICER JONES. She says, “But, you probably can’t even see, either, but.”

174. Taking the phone, OFFICER JONES says, “I can read a little bit here if I hold it.”

175. PLAINTIFF states, “Can you see?”

176. OFFICER JONES scrolls on the phone.

177. PLAINTIFF states, “There’s two,” by which she meant two case numbers.

178. OFFICER JONES mumbles numbers to himself. He hands the phone back to PLAINTIFF and states, “Hm, let me see what I can find.” He starts to walk toward the truck.

179. PLAINTIFF says, “Wait,” following him briefly, and says, “’Cause there’s two.”

180. OFFICER JONES says, “I see it,” and repeats some of the case numbers.

181. PLAINTIFF walks back to the curb, stating, “Alright.”

182. From inside the cab of the police truck, OFFICER JONES says, “You’re welcome” and “I got it.” He begins to search on the computer inside the truck.

183. Outside the police truck, OFFICER PATTERSON says to PLAINTIFF, “Go ahead an have a seat, please.”

184. PLAINTIFF had initially sat of her own volition, but now it was something OFFICER PATTERSON commanded her to do.

185. PLAINTIFF says, “Okay” while looking at her phone and sits down.

186. OFFICER PATTERSON asks PLAINTIFF, “Do you have pepper spray on you today?”

187. PLAINTIFF states, “I don’t answer questions.”

188. OFFICER PATTERSON asks PLAINTIFF “Did you file the police reports online? These cases that we didn’t investigate?”

189. PLAINTIFF remains silent.

190. OFFICER PATTERSON, audibly aggrieved, states, “Ma’am, I’m trying to ask you questions about your case and you don’t want to answer them.”

191. PLAINTIFF replies, “Well, your partner has all the information.”

192. OFFICER PATTERSON interrupts PLAINTIFF stating, “So you, you can’t act like we’re not trying to help you when I’m asking you questions and you’re not answering them.”

193. PLAINTIFF asks OFFICER PATTERSON, “I can remain silent, right? I have a right to remain silent?”

194. To which OFFICER PATTERSON says under his breath, “Oy.”

195. Then, PLAINTIFF rises from the curb and asks for OFFICER PATTERSON’s name and badge number, to which he replies, “Patterson. 291.”

196. Then, PLAINTIFF sits back down.

197. After several moments of silence, OFFICER PATTERSON asks, “Did you want to fill out a witness statement about what happened that day?”

198. In response to this question, PLAINTIFF rises from the curb.

199. OFFICER PATTERSON immediately says, “Have a seat, please.”

200. PLAINTIFF replies, “He’s checking on it.”

201. OFFICER PATTERSON then says again, “Have a seat, please.”

202. Then, PLAINTIFF calls out to OFFICER JONES, “Sir, can I please stand up? Can I stand up, sir?”

203. OFFICER PATTERSON replies, “Ma’am, I’m asking you to sit down.”

204. PLAINTIFF again calls out to OFFICER JONES in the truck, “Can I stand up?”

205. To which JONES replies, without looking away from his screen, “Just listen to whatever my partner has to say.”

206. OFFICER PATTERSON says, “Hey, have a seat please.”

207. PLAINTIFF wanted to rise up from the hot, concrete sidewalk because it was very uncomfortable for PLAINTIFF to sit on the hot, concrete sidewalk for a continued period of time that day; she was wearing shorts and the temperature was approximately 80 degrees with scattered cloud cover[3] so the concrete was very hot against her thin shorts and bare legs.

208. PLAINTIFF starts to explain why she wants to stand due to the heat on the sidewalk; OFFICER PATTERSON, who, just moments before, had stated an intention to “help” PLAINTIFF now interrupts her by stating, “Ma’am, I want you to have a seat, because, here’s the deal, you’re a little unstable and I want you to sit down.”

209. PLAINTIFF replies, “I’m okay.”

210. OFFICER PATTERSON states, “Okay, listen to me, I want you to sit down.”

211. PLAINTIFF replies, “Well, I want to stand up, sir. Is that okay? For me to

---

[3] For the approximate weather in Sparks, Nevada, on this day, see https://www.timeanddate.com/weather/@5512862/historic?month=6&year=2020.

stand up?"

212. OFFICER PATTERSON interrupts saying, "No, it's not."

213. PLAINTIFF calls past OFFICER PATTERSON to OFFICER JONES, who is still in the cab of the police truck, asking, "Sir, can I stand up, please? My behind hurts. Can I stand up, please, sir?"

214. OFFICER JONES states, "Hey, I'm trying to read the case. I'm trying to figure out. I'm trying to read your case. Give me a second."

215. OFFICER PATTERSON audibly sighs and says, "Come over here, have a seat right here," pointing to the hot, metal bumper on the front of the police truck.

216. OFFICER PATTERSON then yells, saying, "Hey! Have a seat right over here."

217. PLAINTIFF asks "Have a seat where?"

218. OFFICER PATTERSON replies, "Have a seat on the push bumper."

219. PLAINTIFF replies, "No, I want to stand. Why can't I stand, sir?"

220. To which OFFICER PATTERSON replies, "Well, because you're unstable."

221. PLAINTIFF states, "I am not unstable at all."

222. OFFICER PATTERSON talks over her, stating, "You're out here in the hills, yelling at people, you're spraying people with pepper spray. You *are* unstable. You don't think that that's weird behavior? Standing in the hills, yelling at people, and spraying them with pepper spray?"

223. PLAINTIFF then states, "I don't answer questions, sir."

224. To which OFFICER PATTERSON replies, "Okay."

225. OFFICER JONES then leaves the cab of the police truck and closes the door. PLAINTIFF is standing.

226. OFFICER JONES states, "Okay, so, so I read the case. Um, so, basically

his side of the story, um, just so you're aware, 'cause I responded out to his address 'cause he called us immediately after being pepper sprayed is that him and his wife were walking with the dogs off the leash and there's some *verbal* altercation between you guys. Okay. At what point, he says he comes up on the hill *to tell you to knock off whatever you're yelling*, and then you pepper-spray him, okay. He didn't want to, he didn't want to press charges for that. So it was some trouble for the day. I read you side of the story. It sounds like you guys just need to stay away from each other." (Emphasis added.)

227. It is clear here that OFFICER JONES viewed the disagreement between Mr. Saults and Ms. WARREN as verbal only, even though Saults had made physical contact with Ms. WARREN, had battered her.

228. PLAINTIFF asks, "Well, so what happened with my complaint? Are you going to investigate, press charges on my complaint?"

229. OFFICER JONES reaches a legal conclusion, "There's nothing to press charges on. There's nothing to substantiate that based on his story and your story, based on that whole interaction—"

230. PLAINTIFF interrupts, "Well, did you get that there, there was video tape evidence that I gave as well. So."

231. Disregarding Ms. WARREN'S statement about evidence that should have been reviewed, OFFICER JONES asks, "What did you want to press charges for?"

232. PLAINTIFF says, "The same thing he was going to press charges for."

233. OFFICER JONES asks, "For battery?"

234. PLAINTIFF says, "That's right. Assault and battery."

235. OFFICER JONES interrupts stating, "No, he, he didn't batter you."

236. PLAINTIFF replies, "Okay, well, listen, so am I free to go?"

237. OFFICER JONES states, "You are free to go."

238. PLAINTIFF picks up her bag and says, “Thank you. Have a good day, you fucking assholes.”

239. This entire ordeal lasted about 14 minutes, according to the videos.

240. OFFICER JONES says, “Okay, you’re welcome,” then yells at PLAINTIFF as she is walking away, “I would stay out of this area since you have issues with all the neighbors, okay?”

241. “‘This area’” is also PLAINTIFF’S neighborhood, so SPARKS POLICE DEPARTMENT was essentially saying that PLAINTIFF was a criminal for being in her own neighborhood.

242. On information and belief, SPARKS POLICE DEPARTMENT perceived PLAINTIFF as someone who did not belong in her own neighborhood because she is African-American.

243. PLAINTIFF replies to OFFICER JONES, “I don’t have any issues with anybody. Have a good day.”

244. OFFICER JONES states, “Okay, well, you live in the apartment complex, so I would stay down there.”

245. Here, OFFICER JONES implies that PLAINTIFF is not free to walk on the fire trail that Mr. Saults, Caucasian, is free to walk on, for several reasons, including because PLAINTIFF is not a freeholder.

246. PLAINTIFF walks back and OFFICER JONES asks, “Do you have any other questions?” to which PLAINTIFF replies, “Fuck off.”

247. At this point, both OFFICERS JONES and PATTERSON get back into their truck.

248. Nothing more occurred between PLAINTIFF and SPARKS POLICE DEPARTMENT between Sunday, June 14, 2020 and Friday, June 19, 2020.

249. Then, on Saturday, June 20, 2020, PLAINTIFF was arrested by SPARKS POLICE DEPARTMENT for first degree misdemeanor stalking of Steven

Saults, the man with the unleashed dogs who had attempted to grab PLAINTIFF'S arm and knock PLAINTIFF'S phone out of her hand while calling her a "fat nigger bitch."

250. Upon returning home on the afternoon of June 20, 2020, PLAINTIFF saw her neighbors in their front yards and a maintenance man, Joe Garcia, outside her apartment building, the Villas at d'Andrea Apartments in Sparks.

251. Two police officers, GINGER MILLER and SPARKS POLICE OFFICER DOE 1, an unidentified white male officer, approached PLAINTIFF.

252. PLAINTIFF'S arrest is documented on one body cam video from SPARKS POLICE OFFICER DOE 1; OFFICER GINGER MILLER's body cam video has not been released to PLAINTIFF or PLAINTIFF'S counsel.

253. This is problematic, because OFFICER MILLER was the officer who actually placed PLAINTIFF in the police vehicle and who had a protracted conversation with PLAINTIFF leading to the vehicle.

254. SPARKS POLICE OFFICER DOE 1 begins the exchange by walking up to PLAINTIFF and saying, "Hi, how's it going?" PLAINTIFF is holding groceries.

255. PLAINTIFF remains silent but is recording on her phone.

256. PLAINTIFF turns to leave and says, "You guys have a good day now."

257. Both OFFICER MILLER and SPARKS POLICE OFFICER DOE 1 tell PLAINTIFF to stop.

258. POLICE OFFICER DOE says, "We have to have a conversation with you about something."

259. OFFICER MILLER batters PLAINTIFF when she touches PLAINTIFF'S arm, compelling PLAINTIFF to put down her shopping.

260. OFFICER MILLER continues to hold PLAINTIFF'S left wrist as she pulls a grocery bag off PLAINTIFF'S shoulder.

261. Then, OFFICER MILLER takes PLAINTIFF'S phone away as POLICE OFFICER DOE says, "We will tell you. Just for our safety, we're going to place you in handcuffs, okay? And then we'll explain everything to you, okay?"

262. OFFICER MILLER continues to batter PLAINTIFF by placing her arms behind her back.

263. PLAINTIFF says, "Okay. Okay." Then, she asks, "Am I under arrest?"

264. POLICE OFFICER DOE says, "I'm not sure. Give us one second. 'Cause I'm not the investigating officer."

265. At this point, OFFICER MILLER, having placed another of PLAINTIFF'S bags on the ground, handcuffs PLAINTIFF.

266. Bizarrely, SPARKS POLICE OFFICER DOE 1's body cam footage has an instrumental musical background at this point for no known reason even though it does not appear that anyone else nearby is playing music.

267. POLICE OFFICER DOE says, "I appreciate you cooperating."

268. The cuffs pinch PLAINTIFF, who flinches, and OFFICER MILLER apologizes.

269. POLICE OFFICER DOE then walks to the side of OFFICER MILLER and PLAINTIFF and says, "If you want to just have her step forward,"

270. Then, OFFICER MILLER says something inaudible and leads PLAINTIFF to a shaded area near a staircase at her apartment building.

271. OFFICER MILLER then says, 'I'm going to read you something," and proceeds to Mirandize PLAINTIFF.

272. OFFICER MILLER then asks, "Do you understand the rights I just read to you?" to which PLAINTIFF replies, "Yes."

273. OFFICER MILLER then says, "Okay, so, I have you under arrest for, uh, stalking of Mr. Warren on Culpepper. Do you know who I'm talking about."

274. OFFICER MILLER did not have the surnames of the parties correct;

PLAINTIFF'S last name is "WARREN;" her assailant is Steven Saults, so GINGER MILLER was not even clear on who she was prosecuting.

275. OFFICER MILLER continues, "Do you remember the case, that, um, you sent to the front desk? For . . . harassment? For the pepper spray incident?"

276. PLAINTIFF states, "Um, I'm going to remain silent."

277. OFFICER MILLER, in a chipper voice, then states, "Ok! Which is your right. Let's go ahead and go down to my car."

278. PLAINTIFF then stalls, saying, "Oh, but wait, can I just, but just explain it to me."

279. OFFICER MILLER again batters PLAINTIFF by touching her and says, "You can keep talking," as she leads PLAINTIFF to the waiting police SUV.

280. OFFICER MILLER then asks, "Explain what to you?"

281. PLAINTIFF asks, "What are you arresting me for?"

282. OFFICER MILLER replies, "Stalking."

283. OFFICER MILLER then bends down to collect PLAINTIFF'S property stating, "I'm going to grab everything you got. My partner's going to grab it."

284. SPARKS POLICE OFFICER DOE 1 then says, "I'm going to grab your stuff. I'm going to put it all in your bag here, okay?"

285. OFFICER MILLER then says, "We're just going to walk down to the car."

286. At this point, the music in the video obscures the viewer's ability to make out anything more that OFFICER MILLER says to PLAINTIFF.

287. OFFICER MILLER and PLAINTIFF had a very long walk through the apartment complex, and all of the audio from their conversation is currently missing.

288. At one point, we can hear PLAINTIFF asking OFFICER MILLER, "How did you find out [unintelligible]."

289. Then, POLICE OFFICER DOE teases PLAINTIFF for the weight of her

bag, asking, “You got bricks in here? This heavy!”

290. Having arrived at the police SUV, OFFICER MILLER then pats down PLAINTIFF, asking if she is carrying anything in her bra.

291. OFFICER MILLER then places PLAINTIFF in the back of the police SUV.

292. OFFICER MILLER then walks to the back of the SUV to discuss with POLICE OFFICER DOE what to do with PLAINTIFF’S property. OFFICER MILLER states, “Well?”

293. POLICE OFFICER DOE states, “There’s a lot of stuff in there. Stuff’s heavy.” He chuckles. “I don’t know what she’s carrying, but.”

294. OFFICER MILLER asks, “Is this food?”

295. POLICE OFFICER DOE states, “I don’t know. Some of it looks like food, but, somethin’ in there’s heavy.”

296. OFFICER MILLER says, “I’m going to go grab gloves.”

297. Having retrieved gloves from the vehicle, OFFICER MILLER then says to POLICE OFFICER DOE, “I’ve been looking for her for awhile.”

298. This is a critical piece of evidence because it suggests that SPARKS POLICE DEPARTMENT viewed MS. WARREN as a criminal assailant from the very beginning of her attempts to document Mr. Saults’ battery of her.

299. At this point, POLICE OFFICER DOE turns off his bodycam audio.

300. OFFICER MILLER can be seen speaking to POLICE OFFICER DOE, and POLICE OFFICER DOE can be seen gesticulating, as OFFICER MILLER puts on the gloves.

301. Then, POLICE OFFICER DOE can be seen putting on gloves as OFFICER MILLER opens up the trunk to the SUV.

302. Then, a woman from, on information and belief, the leasing office for the apartment building, walks up and speaks at length to SPARKS POLICE OFFICER DOE 1, whose bodycam audio is off.

303. POLICE OFFICER DOE speaks to her for a time and the woman then walks away, but none of their conversation is intelligible because SPARKS POLICE OFFICER DOE 1's body cam audio is turned off.

304. OFFICER MILLER searches PLAINTIFF'S possessions, which includes unloading her groceries piecemeal and going through the cards in PLAINTIFF'S wallet.

305. SPARKS POLICE OFFICER DOE 1 then turns the audio on his body cam back on.

306. OFFICER GINGER MILLER shakes her head to herself as if something has been confirmed as she flips through PLAINTIFF'S wallet cards.

307. Once OFFICER MILLER is finished with her searching, SPARKS POLICE OFFICER DOE 1 also takes off his gloves.

308. OFFICER MILLER then goes to ask PLAINTIFF something. This exchange is lost because we do not have OFFICER MILLER's body cam video.

309. We can almost hear PLAINTIFF asking OFFICER MILLER for the groceries to be dropped off.

310. OFFICER MILLER then returns to the back of the SUV and says to SPARKS POLICE OFFICER DOE 1, "Her mom Nancy lives up at the apartment, and this is all her mail and stuff."

311. SPARKS POLICE OFFICER DOE 1 interrupts and says, "Okay, which apartment is it?"

312. PLAINTIFF calls from the back seat of the police SUV, "She has the number."

313. OFFICER MILLER states, "924."

314. SPARKS POLICE OFFICER DOE 1 replies, "924?"

315. OFFICER MILLER replies, "Yeah, it's up in the corner."

316. SPARKS POLICE OFFICER DOE 1 then says, "Okay. I don't think that

bag's going to hold both of them," to which OFFICER MILLER replies, "I don't think so."

317. SPARKS POLICE OFFICER DOE 1 then says, "let me take this one, though."

318. At this point, the body cam video follows SPARKS POLICE OFFICER DOE 1 on his perambulations to deliver PLAINTIFF'S mother's groceries.

319. Notably, when he arrives at Apartment 924, PLAINTIFF'S mother, who is inside, does not open the door.

320. But the more crucial body cam video—that of OFFICER GINGER MILLER—has not been given to PLAINTIFF or PLAINTIFF'S counsel.

321. We do have video from the back of the police SUV; for the vast majority of PLAINTIFF'S ride in the police SUV, she is silent.

322. After being released from jail, PLAINTIFF subsequently learned that the police had knocked on the doors of the surrounding apartments and had told PLAINTIFF'S neighbors that they were looking for her.

323. In audio evidence subsequently obtained, the maintenance man for the Villas at d'Andrea Apartments, Jose Garcia, states that he believes the police have "probable cause" to arrest PLAINTIFF and identifies OFFICER GINGER MILLER by name.

324. On information and belief, this means that Mr. Garcia had been coached regarding preparing for PLAINTIFF'S arrest and PLAINTIFF had also been defamed to the maintenance man by SPARKS POLICE DEPARTMENT.

325. OFFICERS MILLER and DOE 1 smashed food that PLAINTIFF had purchased for her mother; PLAINTIFF'S pepper spray was also confiscated and the shorts she was wearing were eventually lost by the police while PLAINTIFF languished in jail.

326. When PLAINTIFF was photographed for her arrest photo, OFFICER

MILLER pulled off PLAINTIFF'S hat revealing her bald head because PLAINTIFF suffers from alopecia.

327. Officer MILLER, who is not a detective, also contacted PLAINTIFF'S mother over the phone and asked PLAINTIFF'S mother for private medical information regarding PLAINTIFF.

328. At some point amid this ordeal, Steven Saults claimed to the police that PLAINTIFF had thrown watermelon rinds in the Saults' backyard.

329. PLAINTIFF is highly allergic to all parts of a watermelon: the rinds, seeds, pulp, and juice.

330. The association of African-Americans with watermelon consumption is a longstanding racial stereotype in the United States.

331. PLAINTIFF, who had herself been battered and had faced hateful racial epithets from Steven Saults, languished in the WASHOE COUNTY JAIL for a week, from June 20 to June 26, 2020.

332. PLAINTIFF was kept in WASHOE COUNTY JAIL even though, with no criminal record and no prior arrests, she should have been released on her own recognizance.

333. During the *entire* course of PLAINTIFF'S confinement, PLAINTIFF was placed in solitary confinement within WASHOE COUNTY JAIL for no known reason.

334. After being released from jail, PLAINTIFF discovered that her car, which was legally parked on a side street near her apartment building, had a tow sticker on it for no reason; the tow notice affixed to the car was dated June 23, 2020 and signed by an Officer "432"; PLAINTIFF removed the sticker and drove her car closer to her apartment.

335. PLAINTIFF hired a criminal defense attorney, Richard Davies, who, in September 2020, cut a deal with the city attorney that all charges would be

dropped if PLAINTIFF agreed to wait a year before returning to court.

336. Thus, on Wednesday, September 15, 2021, all criminal charges against PLAINTIFF were dropped.

337. Unbeknownst to PLAINTIFF at the time, this year-long delay cut into the time PLAINTIFF had to file this civil matter against DEFENDANTS.

338. Following her false arrest, PLAINTIFF and her elderly mother were harassed by neighbors at the Villas at d'Andrea Apartments so badly that they had to move across Reno to a new apartment at significant cost to them.

339. Reno is so small that the new apartment eventually also found out about the arrest; on information and belief, this was because of ongoing defamation of PLAINTIFF by SPARKS POLICE DEPARTMENT.

340. PLAINTIFF and her mother then had to relocate to Las Vegas to escape ongoing harassment by neighbors and the threat to their civil rights and safety by SPARKS POLICE DEPARTMENT.

341. In November 2021, PLAINTIFF was training at a new job she had secured in Las Vegas when one of her co-workers teased her by showing her a copy of her arrest photo in which she appears bald.

342. The classmate indicated that he had obtained the photo from the course instructor.

343. PLAINTIFF asked her employer where the photo was obtained as it cannot be found online.

344. PLAINTIFF called the Washoe County Sherriff's Office for more information.

345. The Sherriff's office stated to PLAINTIFF that arrest photos are only public records while someone is incarcerated but that, after incarceration ends, the photos are removed from the Sherriff's website.

346. The Sherriff's office indicated that there were only two ways for the arrest

photo to be obtained after it was taken down from their website: First, the previously-incarcerated person could request it. Second, SPARKS POLICE DEPARTMENT could request it.

347. Thus, on information and belief, DOE officers working for SPARKS POLICE DEPARTMENT placed this booking photo online and/or gave a copy to PLAINTIFF'S new employer in Las Vegas an effort to continue to harass PLAINTIFF from another county.

348. After PLAINTIFF complained about the arrest photo to her employer, she was placed on administrative leave and ultimately fired.

349. PLAINTIFF has had additional problems happen to her as a result of interference by, on information and belief, the LAS VEGAS METROPOLITAN POLICE DEPARTMENT; these include but are not limited to:

a. Possible involvement in PLAINTIFF'S booking photo being released to her new employer in Las Vegas;
b. Known interference with PLAINTIFF'S and her mother's property as it was being transported by U-Haul from Northern to Southern Nevada, who admitted to PLAINTIFF on the telephone their employees' collusion with both SPARKS POLICE DEPARTMENT and the LAS VEGAS METROPOLITAN POLICE DEPARTMENT when transporting and temporarily losing the property;
c. Unwarranted surveillance at PLAINTIFF'S new Airbnb upon first moving to Las Vegas;
d. Being followed by both uniformed and plain clothes LAS VEGAS METROPOLITAN POLICE DEPARTMENT officers when PLAINTIFF leaves her apartment building by car;
e. Being told by her internet service provider T-Mobile that the POLICE

are currently paying for her internet connection;

f. Being harassed at home, including by having LAS VEGAS METROPOLITAN POLICE DEPARTMENT bang on her door, allegedly at the behest of a neighbor, and wait around her apartment at night;

g. Being accused by the property managers at her building of violating community standards using videos skimmed from PLAINTIFF'S *own* surveillance cameras operating on PLAINTIFF'S *own* WiFi connection (the WiFi that T-Mobile has admitted the POLICE compensate).

350. Plaintiff suffered from alopecia, depression, and anxiety prior to this ordeal; subsequent to this ordeal, she has new health problems, including, hidradenitis suppurativa, a painful skin condition acquired after PLAINTIF languished in the filthy conditions inside WASHOE COUNTY JAIL in solitary confinement for six days, PTSD, and paranoia.

## *—STATE CLAIMS—*

## V.

## FIRST CLAIM FOR RELIEF

### ***Assault***

**(Asserted against DEFENDANTS SPARKS POLICE DEPARTMENT, WASHOE COUNTY JAIL, SPARKS POLICE OFFICERS Doe JONES, Doe PATTERSON, GINGER MILLER, and SPARKS POLICE OFFICER DOE 1, DOE CORRECTIONS OFFICER(S) FOR WASHOE COUNTY JAIL, DOE GOVERNMENT ENTITIES 4 THROUGH 10, and DOE INDIVIDUALS 6 THROUGH 50)**

351. PLAINTIFF incorporates by reference all other allegations in this *Complaint*, as though fully set forth herein.

352. DEFENDANT SPARKS POLICE DEPARTMENT intended to put PLAINTIFF in imminent apprehension of bodily harm when they forced her to remain seated on the hot concrete in front of their truck on a hot summer day in Sparks, Nevada, on June 14, 2020.

353. When PLAINTIFF was detained as she attempted to arise from the hot concrete, PLAINTIFF imminently apprehended that she could become the victim of grave physical danger.

354. During this ordeal, PLAINTIFF openly stated her fear of being shot by the police.

355. DEFENDANT SPARKS POLICE DEPARTMENT intended to put PLAINTIFF in imminent apprehension of bodily harm when they arrested her without cause on June 20, 2020.

356. When PLAINTIFF was falsely arrested, she imminently apprehended that she could become the victim of grave physical danger.

357. DEFENDANT WASHOE COUNTY JAIL intended to put PLAINTIFF in imminent apprehension of bodily harm when they forced her to remain in solitary confinement for the entire six days that she was jailed.

358. While within solitary confinement, PLAINTIFF imminently apprehended that she could become the victim of grave physical danger.

359. PLAINTIFF has suffered psychological trauma as a result of the violent and threatening behavior of officers working for DEFENDANTS SPARKS POLICE DEPARTMENT and WASHOE COUNTY JAIL.

360. Accordingly, PLAINTIFF is entitled to recover all available damages, including—but not limited to—punitive damages, if available, as allowed by law, in an amount to be determined at trial.

361. As a further result of the culpable conduct of the DEFENDANTS, as alleged in this cause of action, PLAINTIFF has had to retain the services of attorneys

in this matter, for which she seeks costs and reasonable attorneys' fees.

## VI.

## SECOND CLAIM FOR RELIEF

***Battery***

**(Asserted against DEFENDANTS SPARKS POLICE DEPARTMENT, WASHOE COUNTY JAIL, SPARKS POLICE OFFICERS GINGER MILLER AND SPARKS POLICE OFFICER DOE 1, DOE CORRECTIONS OFFICER(S) FOR WASHOE COUNTY JAIL, DOE GOVERNMENT ENTITIES 4 THROUGH 10, and DOE INDIVIDUALS 6 THROUGH 50)**

362. PLAINTIFF incorporates by reference all other allegations in this *Complaint*, as though fully set forth herein.

363. The unwanted, aggressive, and, ultimately, physical behavior of DEFENDANT SPARKS POLICE DEPARTMENT in falsely arresting PLAINTIFF on June 20, 2020 constituted harmful and offensive contacts with the PLAINTIFF'S person that were not warranted at law; it was not illegal for PLAINTIFF to walk in her neighborhood without identification and PLAINTIFF had not committed a crime when she defended herself against a battery and hate crime by Mr. Saults on May 7, 2020.

364. PLAINTIFF was directly physically impaired by the harmful and offensive contact of DEFENDANT SPARKS POLICE DEPARTMENT against her person on Saturday, June 20, 2020.

365. PLAINTIFF was directly physically impaired by the harmful and offensive contact of DEFENDANT WASHOE COUNTY JAIL, who allowed PLAINTIFF to languish in solitary confinement for seven days without cause.

366. PLAINTIFF was both physically and psychologically injured as a result of DEFENDANTS' battery of her.

367. Accordingly, PLAINTIFF is entitled to recover all available damages, including—but not limited to—punitive damages, if available, as allowed by law, in an amount to be determined at trial.

368. As a further result of the culpable conduct of the DEFENDANTS, as alleged in this cause of action, PLAINTIFF has had to retain the services of attorneys in this matter, for which she seeks costs and reasonable attorneys' fees.

**VII.**

**THIRD CLAIM FOR RELIEF**

***False Imprisonment / Unlawful Arrest***

**(Asserted against DEFENDANTS SPARKS POLICE DEPARTMENT, WASHOE COUNTY JAIL, SPARKS POLICE OFFICERS Doe JONES, Doe PATTERSON, GINGER MILLER, and SPARKS POLICE OFFICER DOE 1, DOE CORRECTIONS OFFICER(S) FOR WASHOE COUNTY JAIL, DOE GOVERNMENT ENTITIES 4 THROUGH 10, and DOE INDIVIDUALS 6 THROUGH 50)**

369. PLAINTIFF incorporates by reference all other allegations in this *Complaint*, as though fully set forth herein.

370. On June 14, 2020, DEFENDANT SPARKS POLICE DEPARTMENT intended to confine and restrain PLAINTIFF to an area from which she could not escape when they compelled her to remain seated on the hot concrete in front of their truck that was also spewing exhaust fumes that were accumulating near to PLAINTIFF'S person without arresting her.

371. DEFENDANT SPARKS POLICE DEPARTMENT did actually confine PLAINTIFF to an area from which she could not escape when they compelled her to remain seated on the hot concrete in front of their truck that was also spewing exhaust fumes that were accumulating near to PLAINTIFF'S person without arresting her.

372. Once PLAINTIFF was so confined, there was no reasonable means for her to escape.

373. PLAINTIFF was conscious of her confinement; she was not able to leave the area where she was confined to, including the immediate area in front of the police truck for about fourteen minutes, during which time, she was afraid of being shot.

374. Part of this confinement occurred because the police deemed PLAINTIFF to be "unstable" without any evidence that PLAINTIFF presented a mental health threat to herself or others apart from the fact that she had successfully defended herself against Steven Saults, a man who had battered PLAINTIFF and had been screaming racial epithets at her.

375. Then, on June 20, 2022, PLAINTIFF was falsely arrested by OFFICERS MILLER and SPARKS POLICE OFFICER DOE 1 when she was arrested for something that was not a crime: "taking pictures of that guy with the dogs" and because "he is afraid of you."

376. PLAINTIFF was falsely arrested because she was charged for stalking when she had not actually stalked anyone; in fact, she had been followed and battered by the dog owner and was subsequently stalked by SPARKS POLICE DEPARTMENT who: a.) monitored PLAINTIFF while she was walking in her neighborhood and b.) defamed PLAINTIFF to her neighbors and the staff at her apartment building.

377. PLAINTIFF was falsely arrested because the charges against her for stalking were ultimately dropped a year later.

378. PLAINTIFF was falsely arrested because SPARKS POLICE lacked probable cause to arrest PLAINTIFF for stalking on June 20, 2020; racial bias against African-Americans is not probable cause.

379. PLAINTIFF was falsely arrested because SPARKS POLICE lacked

reasonable suspicion to arrest PLAINTIFF for stalking on June 20, 2020; racial bias against African-Americans is not reasonable suspicion.

380. Following PLAINTIFF'S false arrest, she languished in WASHOE COUNTY JAIL for a week, during which entire time, the jail placed her in solitary confinement without explanation.

381. PLAINTIFF was hurt by all three periods of confinement by SPARKS POLICE DEPARTMENT and WASHOE COUNTY JAIL in an amount to be determined at trial; in each instance, she was removed from her intended course of travel by walking in her neighborhood where she had the lawful right to be, and she was removed from her home and family and placed in WASHOE COUNTY JAIL.

382. As a result of DEFENDANTS' unlawful false imprisonment of PLAINTIFF, PLAINTIFF was afraid for her physical safety throughout all three periods of her confinement.

383. PLAINTIFF has suffered emotionally as a result of these three periods of confinement and she has suffered physically in that she developed hidradenitis suppurativa, a painful skin condition, following her jailing.

384. Accordingly, PLAINTIFF is entitled to recover all available damages, including—but not limited to—punitive damages, if available, as allowed by law, in an amount to be determined at trial.

385. As a further result of the culpable conduct of the DEFENDANTS, as alleged in this cause of action, PLAINTIFF has had to retain the services of attorneys in this matter, for which she seeks costs and reasonable attorneys' fees.

//

//

//

//

## VIII.

## FOURTH CLAIM FOR RELIEF

### *Malicious Prosecution*, NRS § 199.310

**(Asserted against DEFENDANTS SPARKS POLICE DEPARTMENT, WASHOE COUNTY JAIL, DOE GOVERNMENT ENTITIES 4 THROUGH 10, SPARKS POLICE OFFICERS Doe JONES, Doe PATTERSON, GINGER MILLER, and SPARKS POLICE OFFICER DOE 1, DOE CORRECTIONS OFFICER(S) FOR WASHOE COUNTY JAIL, and DOE INDIVIDUALS 6 THROUGH 50)**

386. PLAINTIFF incorporates by reference all other allegations in this *Complaint*, as though fully set forth herein.

387. Malicious prosecution occurs in Nevada when "a person who maliciously and without probable cause therefor, causes or attempts to cause another person to be arrested or proceeded against for any crime of which that person is innocent." NRS § 199.310.

388. PLAINTIFF was not guilty of a crime when she successfully defended herself against a battery and a hate crime on May 7, 2020.

389. PLAINTIFF was not guilty of a crime when she was not carrying identification with her on June 14, 2020.

390. PLAINTIFF was not guilty of any crime, including stalking, when she was falsely arrested on June 20, 2020.

391. PLAINTIFF was not guilty of a crime for walking in her neighborhood or walking along the fire path near her neighborhood, where, in each case, she had the legal right to be.

392. DEFENDANT SPARKS POLICE DEPARTMENT did not have probable cause to detain or arrest PLAINTIFF on June 14, 2020.

393. DEFENDANT SPARKS POLICE DEPARTMENT did not have probable cause to detain or arrest PLAINTIFF on June 20, 2020.

394. DEFENDANT WASHOE COUNTY JAIL did not have probable cause to detain and imprison PLAINTIFF following her arrest by DEFEDANT SPARKS POLICE DEPARTMENT.

395. Probable cause is "that line [which] draws a meaningful distinction between an officer's mere inkling and the presence of facts within the officer's personal knowledge which would convince a reasonable man that the person seized has committed, is committing, or is about to commit a particular crime." *Terry v. Ohio*, 392 U.S. 1, 38 (1968); in Nevada, "probable cause is a standard of reasonableness which must be interpreted in a common-sense and realistic manner." *Azbill v. State*, 84 Nev. 345, 358 (Nev. 1968).

396. A police officer's racial bias against an African-American woman who has successfully defended herself against a battery and a hate crime by a white man is not probable cause.

397. DEFENDANT SPARKS POLICE DEPARTMENT did not have reasonable suspicion to detain or arrest PLAINTIFF on June 14, 2020.

398. DEFENDANT SPARKS POLICE DEPARTMENT did not have reasonable suspicion to detain or arrest PLAINTIFF on June 20, 2020.

399. The U.S. Supreme Court "has recognized that an officer's reasonable suspicion that a person may be involved in criminal activity permits the officer to stop the person for a brief time and take additional steps to investigate further." *Hiibel v. Sixth Jud. Dist. Ct. of Nev., Humboldt Cty*, 542 U.S. 177, 178 (2004).

400. In walking around her neighborhood on June 14, 2020, and in walking from her car to her apartment on June 20, 2020, PLAINTIFF had done nothing to indicate that she was involved in any criminal activity.

401. A police officer's racial bias against an African-American woman who has successfully defended herself against a battery and a hate crime by a white man

is not reasonable suspicion.

402. DEFENDANT SPARKS POLICE DEPARTMENT was at least negligent in carrying out this detention, and, later, false arrest, as no officer from the DEPARTMENT had reasonable suspicion nor probable cause for arresting PLAINTIFF.

403. DEFENDANT SPARKS POLICE DEPARTMENT's attempt to detain PLAINTIFF on June 14, 2020 was not sufficient to establish reasonable suspicion or probable cause for their later arrest of PLAINITFF on June 20th.

404. In fact, on June 14, 2020, and again on June 20, 2020, PLAINTIFF was falsely detained, imprisoned, and arrested in retaliation for her good faith attempt to defend herself against a battery and a hate crime by a white man.

405. DEFENDANT WASHOE COUNTY JAIL facilitated and participated in the illegal detention of PLAINTIFF at the hands of DEFENDANT SPARKS POLICE DEPARTMENT.

406. PLAINTIFF was innocent of every crime, and yet, she was unlawfully detained, falsely imprisoned, falsely arrested, and prosecuted by DEFENDANT SPARKS POLICE DEPARTMENT in contravention of Nevada law.

407. Accordingly, PLAINTIFF is entitled to recover all available damages, including—but not limited to—punitive damages, if available, as allowed by law, in an amount to be determined at trial.

408. As a further result of the culpable conduct of the DEFENDANTS, as alleged in this cause of action, PLAINTIFF has had to retain the services of attorneys in this matter, for which she seeks costs and reasonable attorneys' fees.

//

//

//

//

## IX.

## FIFTH CLAIM FOR RELIEF

***Unlawful Injury or Loss Suffered by a Vulnerable Person,***
**NRS § 41.1395**

**(Asserted against ALL DEFENDANTS)**

409. PLAINTIFF incorporates by reference all other allegations in this *Complaint*, as though fully set forth herein.

410. PLAINTIFF is a vulnerable person as defined by NRS § 41.1395 4(e)(1-2) in that she has a physical health impairment—alopecia—and psychological health impairments—depression and anxiety—that limit one or more of her major life activities, and she has medical records of these impairments.

411. Because of her ordeal, PLAINTIFF now also suffers from a very painful skin condition called hidradenitis suppurativa, and from new psychological problems including PTSD and paranoia.

412. DEFENDANT SPARKS POLICE DEPARTMENT and WASHOE COUNTY JAIL were unjustified when they inflicted injury, pain, and anguish on PLAINTIFF with their unlawful use of force lacking in reasonable suspicion and probable cause, as described above.

413. PLAINTIFF'S medical vulnerability was made plain to DEFENDANTS when OFFICER MILLER ripped off PLAINTIFF'S hat for her booking photo.

414. To the extent that SPARKS POLICE DEPARTMENT, LAS VEGAS METROPOLITAN POLICE DEPARTMENT, and/or WASHOE COUNTY JAIL are responsible for the later publication of that booking photo to PLAINTIFF's new employer in Las Vegas, these DEFENDANTS have additionally exploited the medical vulnerability of a vulnerable Nevadan, in contravention of state law.

415. To the extent that PLAINTIFF continues to be surveilled and harassed by

SPARKS POLICE DEPARTMENT and LAS VEGAS METROPOLITAN POLICE DEPARTMENT, working in tandem, both of these government agencies are severely exacerbating PLAINTIFF'S pre-existing disabilities, in contravention of state law.

416. Accordingly, PLAINTIFF is entitled to recover all available damages, including—but not limited to—punitive damages, if available, as allowed by law, in an amount to be determined at trial.

417. In this particular Claim for Relief, PLAINTIFF is entitled to recover two times her damages, as allowed under NRS § 41.1395(1), in an amount to be determined at trial.

418. If it is established by a preponderance of the evidence that DEFENDANTS are liable because they acted with recklessness, oppression, fraud, and/or malice, PLAINTIFF is entitled to attorneys' fees and costs. NRS § 41.1395(2)

## X.
## SIXTH CLAIM FOR RELIEF
### *Public Disclosure of a Private Fact*

**(Asserted against DEFENDANTS SPARKS POLICE DEPARTMENT, WASHOE COUNTY JAIL, LAS VEGAS METROPOLITAN POLICE DEPARTMENT, and DOE GOVERNMENT ENTITIES 4 THROUGH 10)**

419. PLAINTIFF incorporates by reference all other allegations in this *Complaint*, as though fully set forth herein.

420. When, on information and belief, DEFENDANT SPARKS POLICE DEPARTMENT and/or WASHOE COUNTY JAIL and/or LAS VEGAS METROPOLITAN POLICE DEPARTMENT released PLAINTIFF'S arrest photo to her new employer in Las Vegas sometime on or near November 2021,

DEFENDANTS made public the disclosure of a fact about PLAINTIFF'S private medical condition.

421. This disclosure by SPARKS POLICE DEPARTMENT and/or WASHOE COUNTY JAIL and/or LAS VEGAS METROPOLITAN POLICE DEPARTMENT would be highly offensive to a reasonable person because baldness in women is considered ugly, comical, and highly taboo in our image-conscious culture; further, because PLAINTIFF is African-American, baldness only heightens her vulnerability as a member of a protected class.

422. This disclosure by SPARKS POLICE DEPARTMENT and/or WASHOE COUNTY JAIL and/or LAS VEGAS METROPOLITAN POLICE DEPARTMENT was communicated to the general public either via the Internet and/or by placing the photograph in the hands of someone who could be counted upon to distribute it to PLAINTIFF'S new work acquaintances in Las Vegas.

423. The disclosure of the private fact of PLAINTIFF'S alopecia is not newsworthy and serves no legitimate public or public safety interest.

424. While PLAINTIFF'S arrest photo from July 2020 may arguably have been a matter of public record at the time when she was incarcerated, it was no longer a matter of public record by November 2021 when PLAINTIFF had moved from Reno and was living and working in Las Vegas.

425. By the Washoe County Sherriff's own admission, DEFENDANT SPARKS POLICE DEPARTMENT is at fault for making this disclosure since there were only two ways for the arrest photo to be obtained once it had been removed from the Sherriff's website: either via a request from PLAINTIFF herself, or, via a request from someone in SPARKS POLICE DEPARTMENT.

426. The actions of DEFENDANT SPARKS POLICE DEPARTMENT and/or WASHOE COUNTY JAIL and/or LAS VEGAS METROPOLITAN POLICE DEPARTMENT are both the actual and proximate cause of the harm the

PLAINTIFF has suffered, harm which includes public humiliation and firing from her job.

427. PLAINTIFF has additionally suffered significant emotional distress and mental anguish as a result of this embarrassing disclosure.

428. Because of DEFENDANTS' public disclosure of a private fact about PLAINTIFF'S medical condition, PLAINTIFF'S reputation, finances, and mental health have suffered to a degree to be determined at trial.

429. Accordingly, PLAINTIFF is entitled to recover all available damages, including—but not limited to—punitive damages, if available, as allowed by law, in an amount to be determined at trial.

430. As a further result of the culpable conduct of the DEFENDANTS, as alleged in this cause of action, PLAINTIFF has had to retain the services of attorneys in this matter, for which she seeks costs and reasonable attorneys' fees.

## XI.

## SEVENTH CLAIM FOR RELIEF

### *Negligence and Gross Negligence*

**(Asserted against ALL DEFENDANTS)**

431. PLAINTIFF incorporates by reference all other allegations in this *Complaint*, as though fully set forth herein.

432. DEFENDANT SPARKS POLICE DEPARTMENT owes a legal duty to PLAINTIFF and to the public to exercise the reasonable care and ordinary prudence that a reasonably prudent police department acting under authority of state law would exercise under the same circumstances, such as when performing a legal *Terry* stop and/or lawful arrest or stopping a woman walking in her neighborhood who had the legal right to be there.

433. DEFENDANT WASHOE COUNTY JAIL owed a legal duty to

PLAINTIFF and to the public to exercise the reasonable care and ordinary prudence that a reasonably prudent county jail acting under authority of state law would exercise under the same circumstances, such as when deciding whether to jail or release an individual.

434. DEFENDANT LAS VEGAS METROPOLITAN POLICE DEPARTMENT owes a legal duty to PLAINTIFF and to the public to exercise the reasonable care and ordinary prudence that a reasonably prudent police department acting under authority of state law would exercise under the same circumstances, such as refraining from surveilling an innocent civilian when that police department has virtually no reasonable suspicion and no probable cause to pursue surveillance against that civilian.

435. As government entities, DEFENDANT SPARKS POLICE DEPARTMENT WASHOE COUNTY JAIL, and LAS VEGAS METROPOLITAN POLICE DEPARTMENT owe a legal duty to the public to employ police officers and correction officers who will exercise the reasonable care and ordinary prudence that a reasonably prudent police officer or correction officer acting under authority of law would exercise under the same circumstances, such as when performing a traffic stop and arrest, when jailing an individual, when deciding to assist a partner police agency with an ongoing investigation, and when deciding to surveil a private citizen.

436. DEFENDANTS' breach of said duty to PLAINTIFF constituted Negligent Hiring and Entrustment, plead at greater length within this *Complaint*, *infra*.

437. All DEFENDANTS breached their duty by failing to exercise the degree of care that was owed to PLAINTIFF, including, but not limited to, by:

a. Stalking the PLAINTIFF in anger in her neighborhood without reasonable suspicion or probable cause;
b. Attempting to batter and detain the PLAINTIFF without reasonable

suspicion or probable cause;

c. Detaining the PLAINTIFF under the pretense of "helping her" but actually with the goal of treating her like a criminal suspect on July 14, 2020;

d. Making a false arrest on June 20, 2020 without a warrant, without reasonable suspicion, and without probable cause;

e. Using excessive force/committing cruel and unusual punishment by confining PLAINTIFF in solitary confinement for the six days that she was in jail;

f. Defaming PLAINTIFF to her neighbors, apartment staff, and co-workers in Las Vegas;

g. Threatening to tow PLAINTIFF'S legally-parked car for no legal reason;

h. Interfering with the transportation of PLAINTIFF'S possessions when she and her mother moved from Reno to Las Vegas in July 2021;

i. Casing PLAINTIFF'S temporary Airbnb where she was staying with her mother after moving to Las Vegas;

j. Implying to PLAINTIFF that she was "under investigation" in Las Vegas without explaining why;

k. Following PLAINTIFF'S car when she leaves her apartment;

l. Taking over PLAINTIFF'S T-Mobile internet account;

m. Surveilling PLAINTIFF without probable cause, reasonable suspicion, or a warrant;

438. When engaging in their culpable conduct described herein, all of the DEFENDANTS were not only negligent, but they were grossly negligent in that they failed to exercise even the slightest amount of care, with a conscious

disregard of the rights or safety of the PLAINTIFF.

439. When engaging in their culpable conduct described herein, all of the DEFENDANTS were grossly negligent because they acted with willful, wanton, and/or reckless disregard for the safety of PLAINTIFF.

440. DEFENDANTS exhibited a conscious disregard for PLAINTIFF'S rights and safety when they knew the probable harmful consequences of their wrongful acts of falsely detaining, falsely arresting, and falsely surveilling the PLAINTIFF which probable harmful consequences included physical and mental injury to her, which DEFENDANTS recklessly, willfully, and/or deliberately failed to act to avoid.

441. Accordingly, PLAINTIFF is entitled to recover all available damages, including—but not limited to—punitive damages, if available, as allowed by law, in an amount to be determined at trial.

442. As a further result of the culpable conduct of the DEFENDANTS, as alleged in this cause of action, PLAINTIFF has had to retain the services of attorneys in this matter, for which she seeks costs and reasonable attorneys' fees.

## XII.
## EIGHTH CLAIM FOR RELIEF
## *Defamation*

**(Asserted against ALL DEFENDANTS)**

443. PLAINTIFF incorporates by reference all other allegations in this *Complaint*, as though fully set forth herein.

444. When DEFENDANT SPARKS POLICE DEPARTMENT stopped PLAINTIFF on June 14, 2020 without probable cause or reasonable suspicion to arrest her, DEFENDANTS published a false and defamatory statement concerning PLAINTIFF'S reputation to her neighbors.

445. When DEFENDANT SPARKS POLICE DEPARTMENT knocked on the doors of PLAINTIFF'S neighbors at the Villas at d'Andrea Apartments in Sparks seeking information regarding PLAINTIFF prior to June 20, 2020, DEFENDANTS published a false and defamatory statement concerning PLAINTIFF'S reputation to her neighbors.

446. When DEFENDANT SPARKS POLICE DEPARTMENT contacted Jose Garcia, the maintenance man for her apartment building, seeking information regarding PLAINTIFF, DEFENDANTS published a false and defamatory statement concerning PLAINTIFF'S reputation to her neighbors and to her apartment's maintenance staff.

447. When DEFENDANT SPARKS POLICE DEPARTMENT ultimately falsely arrested PLAINTIFF on June 20, 2020 and walked her down the length of the community, DEFENDANTS published a false and defamatory statement concerning PLAINTIFF'S reputation to her neighbors.

448. Every time that PLAINTIFF tried to return to her neighborhood following this incident, she was afraid for her safety and felt shame at how she had been publicly humiliated in front of her neighbors and her apartment's maintenance staff.

449. When, on information and belief, DEFENDANT SPARKS POLICE DEPARTMENT and/or WASHOE COUNTY JAIL and/or LAS VEGAS METROPOLITAN POLICE DEPARTMENT published PLAINTIFF'S arrest photo online and/or to her new employer in Las Vegas sometime on or near November 2021, DEFENDANTS published a false and defamatory statement concerning PLAINTIFF'S reputation to her employer.

450. This false and defamatory publication by DEFENDANT SPARKS POLICE DEPARTMENT and/or WASHOE COUNTY JAIL and/or LAS VEGAS METROPOLITAN POLICE DEPARTMENT also disclosed an embarrassing

fact about PLAINTIFF'S private medical condition to the public: the fact that PLAINTIFF suffers from alopecia.

451. After her arrest photo that also discloses her medical condition was released to her Las Vegas employer and PLAINTIFF made inquiries about this; because of the photo and her inquiries, PLAINTIFF was ultimately fired from her new job in Las Vegas.

452. Because of DEFENDANTS' false and defamatory statements about PLAINTIFF, PLAINTIFF'S reputation, work history, finances, physical, and mental health have suffered to a degree to be determined at trial.

453. Accordingly, PLAINTIFF is entitled to recover all available damages, including—but not limited to—punitive damages, if available, as allowed by law, in an amount to be determined at trial.

454. As a further result of the culpable conduct of the DEFENDANTS, as alleged in this cause of action, PLAINTIFF has had to retain the services of attorneys in this matter, for which she seeks costs and reasonable attorneys' fees.

**XIII.**

**NINTH CLAIM FOR RELIEF**

***Public Records Violations*, NRS 239 *et seq.***

**(Asserted against ALL DEFENDANTS)**

455. PLAINTIFF incorporates by reference all other allegations in this *Complaint*, as though fully set forth herein.

456. To date, SPARKS POLICE DEPARTMENT has committed many violations involving the public records at issue in PLAINTIFF'S case; the following list is not exhaustive:

457. First, SPARKS POLICE falsified the date of their police report in order to obscure what had happened to PLAINTIFF on May 7, 2020; on that report,

almost everything is typed except the date, which has been whited out and written in.

458. Second, following PLAINTIFF'S unlawful detention by OFFICERS PATTERSON and JONES on June 14, 2020, SPARKS POLICE refused to release body or dash cam video for either officer; Ms. WARREN's criminal defense attorney Richard Davies could not even obtain this in discovery; the failure to disclose is particularly concerning because, on information and belief, OFFICER PATTERSON has several police misconduct cases currently pending against him in Sparks.

459. Defense counsel for SPARKS POLICE DEPARTMENT has released some videos to PLAINTIFF'S counsel, however, body cam video for OFFICER GINGER MILLER on the day of PLAINTIFF'S arrest is still missing.

460. Third, following PLAINTIFF'S false arrest, in which OFFICER MILLER mis-identified Mr. Saults as "Mr. WARREN," SPARKS POLICE would not release footage from OFFICER MILLER's body cam to PLAINTIFF.

461. This failure to disclose is particularly concerning because OFFICER MILLER, who is not a detective, subsequently attempted to retrieve private medical information about PLAINTIFF from PLAINTIFF'S mother.

462. Fourth, OFFICER MILLER's partner officer, SPARKS POLICE OFFICER DOE 1, cut off the sound and video to his body cam footage during some of PLAINTIFF'S arrest, rendering it useless.

463. Fifth, SPARKS POLICE DEPARTMENT violated PLAINTIFF'S confidentiality and impermissibly disclosed public records pertaining to her when they contacted her apartment's maintenance man Jose Garcia and gave him ideas about their alleged "probable cause" to arrest PLAINTIFF.

464. But for SPARKS POLICE DEPARTMENT'S disclosure, the apartment staff would have no cause to know about Ms. WARREN's dispute with the dog

owner, Steven Saults.

465. Sixth, on information and belief, SPARKS POLICE DEPARTMENT and/or WASHOE COUNTY JAIL and/or LAS VEGAS METROPOLITAN POLICE DEPARTMENT made publicly available and/or somehow released PLAINTIFF'S arrest photo to her new employer in Las Vegas in an effort to harass, intimidate, stalk, and belittle her.

466. This booking photo cannot be found online.

467. Ms. WARREN called the Washoe County Sherriff's Office, who stated to her that such a photo is only a public record when an individual is incarcerated, but that after incarceration is over, the photo is removed from their website.

468. The Washoe County Sherriff's office additionally stated that the only way the picture could be released at this point would be either at Ms. WARREN's own request for it, or at the request of SPARKS POLICE DEPARTMENT.

469. Seventh, LAS VEGAS METROPOLITAN POLICE DEPARTMENT has released no record to Ms. WARREN to justify their ongoing surveillance of her; the most she has been told is that she cannot be given the details of an "ongoing investigation."

470. The intentional behavior of DEFENDANTS to falsify records that they should have preserved in their original form, to reveal records that they should not have revealed, to fail to safeguard records that should have been safeguarded, and to fail to disclose records that should have been disclosed upon PLAINTIFF'S request is the direct and proximate cause of PLAINTIFF'S harm and suffering in this claim for relief.

471. Accordingly, PLAINTIFF is entitled to recover all available damages, including—but not limited to—punitive damages, if available, as allowed by law, in an amount to be determined at trial.

472. PLAINTIFF is also entitled to recover all the remedies available under NRS

239, and any other relief the Court deems appropriate.

473. As a further result of the culpable conduct of the DEFENDANTS, as alleged in this cause of action, PLAINTIFF has had to retain the services of attorneys in this matter, for which she seeks costs and reasonable attorneys' fees.

## XIV.
## TENTH CLAIM FOR RELIEF
### ***Trespass to Chattels***

**(Asserted against DEFENDANTS SPARKS POLICE DEPARTMENT, WASHOE COUNTY JAIL, SPARKS POLICE OFFICERS GINGER MILLER and SPARKS POLICE OFFICER DOE 1, and DOE GOVERNMENT ENTITIES 4 THROUGH 10)**

474. PLAINTIFF incorporates by reference all other allegations in this *Complaint*, as though fully set forth herein.

475. On the day she was arrested, June 20, 2020, PLAINTIFF was carrying with her goods that she had just purchased, including food for her mother.

476. After PLAINTIFF was taken into police custody, the food was returned to her mother smashed and damaged.

477. Once in the custody of the jail, some of PLAINTIFF'S clothing was also lost and never recovered.

478. The intentional behavior of DEFENDANTS damaged property that belonged to PLAINTIFF.

479. The intentional behavior of DEFENDANTS is the actual and proximate cause of the damage to PLAINTIFF'S property that was her own and that was intended for her mother.

480. Accordingly, PLAINTIFF is entitled to recover all available damages, including—but not limited to—punitive damages, if available, as allowed by

law, in an amount to be determined at trial.

481. As a further result of the culpable conduct of the DEFENDANTS, as alleged in this cause of action, PLAINTIFF has had to retain the services of attorneys in this matter, for which she seeks costs and reasonable attorneys' fees.

## XV.

## ELEVENTH CLAIM FOR RELIEF

***Conversion***

**(Asserted against DEFENDANTS SPARKS POLICE DEPARTMENT, WASHOE COUNTY JAIL, SPARKS POLICE OFFICERS GINGER MILLER and SPARKS POLICE OFFICER DOE 1, and DOE GOVERNMENT ENTITIES 4 THROUGH 10)**

482. PLAINTIFF incorporates by reference all other allegations in this *Complaint*, as though fully set forth herein.

483. On the day she was arrested, June 20, 2020, PLAINTIFF was carrying with her a black backpack that contained pepper spray and she was wearing shorts.

484. After PLAINTIFF was taken into police custody, the pepper spray was confiscated permanently by the police and PLAINTIFF'S shorts were never returned to her.

485. Upon PLAINTIFF'S release from jail, she had to wear someone else's pants because her shorts were "just gone," the jail said.

486. The intentional behavior of DEFENDANTS permanently converted property that belonged to PLAINTIFF to their own use.

487. The intentional behavior of DEFENDANTS is the actual and proximate cause of the damage to PLAINTIFF'S property.

488. Accordingly, PLAINTIFF is entitled to recover all available damages, including—but not limited to—punitive damages, if available, as allowed by law, in an amount to be determined at trial.

489. As a further result of the culpable conduct of the DEFENDANTS, as alleged in this cause of action, PLAINTIFF has had to retain the services of attorneys in this matter, for which she seeks costs and reasonable attorneys' fees.

## XVI.
## TWELFTH CLAIM FOR RELIEF
### *Intentional Infliction of Emotional Distress*

**(Asserted against ALL DEFENDANTS)**

490. PLAINTIFF incorporates by reference all other allegations in this *Complaint*, as though fully set forth herein.

491. DEFENDANT SPARKS POLICE DEPARTMENT acted to intentionally to stalk, terrorize, and falsely arrest a Nevada citizen without reasonable suspicion or probable cause, thereby frustrating her constitutional rights.

492. DEFENDANT WASHOE COUNTY JAIL acted intentionally to falsely confine a Nevada citizen without due process of law.

493. DEFENDANT LAS VEGAS METROPOLITAN POLICE DEPARTMENT continues to act intentionally to stalk, frighten, surveil, monitor, intercept, and frustrate the constitutional rights of a Nevada citizen without reasonable suspicion or probable cause.

494. The actions of DEFENDANTS were extreme and outrageous: they detained PLAINTIFF in a place where she had the lawful right to be without reasonable suspicion or probable cause; then, seven days later, they decided to arrest PLAINTIFF for the same reason they had previously detained her but without reasonable suspicion or probable cause sufficient to establish the alleged reason for her arrest: Stalking.

495. Actually, PLAINTIFF had successfully defended herself against battery and hate crime by Steven Saults, a white man with unleashed dogs who had called

PLAINTIFF “a fat nigger bitch.”

496. During her entire week in WASHOE COUNTY JAIL for a crime that she also did not commit, PLAINTIFF was left to languish in solitary confinement for no known reason; PLAINTIFF would have been able to avoid this if she had not been falsely arrested in the first place.

497. Now, PLAINTIFF faces ongoing harassment and surveillance by LAS VEGAS METROPOLITAN POLICE DEPARTMENT even though she has committed no crime in either Clark or Washoe Counties.

498. As a result of the actions of ALL DEFENDANTS, the PLAINTIFF has suffered severe emotional distress and physical harm.

499. The intentional behavior of DEFENDANTS is the direct and proximate cause of PLAINTIFF’S deteriorated health and ongoing mental anguish.

500. Accordingly, PLAINTIFF is entitled to recover all available damages, including—but not limited to—punitive damages, if available, as allowed by law, in an amount to be determined at trial.

501. As a further result of the culpable conduct of the DEFENDANTS, as alleged in this cause of action, PLAINTIFF has had to retain the services of attorneys in this matter, for which she seeks costs and reasonable attorneys’ fees.

**XVII.**

**THIRTEENTH CLAIM FOR RELIEF**

***Civil Conspiracy***

**(Asserted against DEFENDANTS SPARKS POLICE DEPARTMENT, LAS VEGAS METROPOLITAN POLICE DEPARTMENT, and DOE GOVERNMENT ENTITIES 4 THROUGH 10)**

502. PLAINTIFF incorporates by reference all other allegations in this *Complaint*, as though fully set forth herein.

503. In Nevada, "[a]n actionable civil conspiracy is a combination of two or more persons who, by some concerted action, intend to accomplish some unlawful objective for the purpose of harming another which results in damage." *Collins v. Union Fed. Savings Loan*, 99 Nev. 284, 303 (Nev. 1983).

504. PLAINTIFF has been harassed by LAS VEGAS METROPOLITAN POLICE DEPARTMENT since moving to Las Vegas.

505. PLAINTIFF has never been convicted of a crime in Las Vegas, so it is a mystery why LAS VEGAS METROPOLITAN POLICE DEPARTMENT would harass her—but for their knowledge that she is disliked by SPARKS POLICE DEPARTMENT.

506. It would be unlawful for LAS VEGAS METROPOLITAN POLICE DEPARTMENT to do the following without a warrant and without probable cause (this list is not exhaustive):

a. Surveil Ms. WARREN at her Airbnb right when she moved to Las Vegas;
b. Place Ms. WARREN under investigation right when she moved to Las Vegas;
c. Participate in frustrating Ms. WARREN's access to her property as it was being transported south by U-Haul;
d. Release Ms. WARREN'S booking photo from Washoe County to her new, Las Vegas employer long after she had been released from jail;
e. Tail Ms. WARREN in her car whenever she is driving in Las Vegas;
f. On information and belief, conspire with the property managers at Ms. WARREN's apartment building to entrap Ms. WARREN in perceived community standard violations using videos "skimmed" from her *own* surveillance cameras operating on PLAINTIFF'S *own* WiFi;

g. Routinely park outside Ms. WARREN's apartment in an attempt to intimidate her when she returns home from work late at night;

h. Intercept Ms. WARREN'S telecommunications, including her telephone and internet connection, as by paying for the connection out of a "police account."

507. If LAS VEGAS METROPOLITAN POLICE DEPARTMENT has a cognizable warrant or probable cause against Ms. WARREN for an alleged violation of the law in Clark County, PLAINTIFF asks to see that document.

508. Barring this, her treatment by LAS VEGAS METROPOLITAN POLICE DEPARTMENT is harassment meant to frighten and monitor her.

509. To the extent that LAS VEGAS METROPOLITAN POLICE DEPARTMENT illegally undertakes such treatment of Ms. WARREN at the behest of or for the benefit of SPARKS POLICE DEPARTMENT in Washoe County, the two police departments are engaged in a civil conspiracy with one another against Ms. WARREN.

510. The "primary purpose" of such partnership is not protection of the community, but rather, "to cause injury" to Ms. WARREN, a single, Black, female who works at night and who is alone but for taking care of her elderly mother. *Ungaro v. Desert Palace, Inc.*, 732 F. Supp. 1522, 1533 n.3 (D. Nev. 1989).

511. And such civil conspiracy, based in intentional tort, is illegal in this state.

512. Accordingly, PLAINTIFF is entitled to recover all available damages, including—but not limited to—punitive damages, if available, as allowed by law, in an amount to be determined at trial.

513. As a further result of the culpable conduct of the DEFENDANTS, as alleged in this cause of action, PLAINTIFF has had to retain the services of attorneys in this matter, for which she seeks costs and reasonable attorneys' fees.

## —*FEDERAL CLAIMS*—

## XVIII.

## FOURTEENTH CLAIM FOR RELIEF

***Unlawful Discrimination, Harassment, and Retaliation Based on Disability***

**Americans with Disabilities Act and Amendments Act, 42 U.S.C. § 12131 *et seq*. and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794**

**(Asserted against ALL DEFENDANTS)**

514. PLAINTIFF incorporates by reference all other allegations in this *Complaint*, as though fully set forth herein.

515. SPARKS POLICE DEPARTMENT, WASHOE COUNTY JAIL, and LAS VEGAS METROPOLITAN POLICE DEPARTMENT are subject to Title II of the ADA since they are public entities as defined by 42 U.S.C. § 12131(1); their operations constitute local government.

516. Under the ADA's anti-discrimination provision, codified at 42 U.S.C. § 12132, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

517. PLAINTIFF is a qualified individual with a disability as codified at 42 U.S.C. § 12132 because she meets the "essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."

518. Not only does PLAINTIFF suffer from the physical disability of alopecia, she suffers from mental health conditions that have been exacerbated as the direct and proximate result of her treatment by DEFENDANTS SPARKS POLICE DEPARTMENT, WASHOE COUNTY JAIL, and LAS VEGAS METROPOLITAN POLICE DEPARTMENT.

519. DEFENDANTS SPARKS POLICE DEPARTMENT, their OFFICERS, and WASHOE COUNTY JAIL and their OFFICERS were on notice that PLAINTIFF was a qualified individual under Title II for reasons including, but not limited to, the fact that PLAINTIFF'S alopecia was made plain at the time when her booking photo was taken.

520. DEFENDANT SPARKS POLICE DEPARTMENT, through their officers, directors, managers, supervisors, agents, and/or employees discriminated against PLAINTIFF on the basis of her disabilities by forcibly removing PLAINTIFF from her intended path of travel where she had the legal right to be on two separate dates in June 2020: June 14, 2020 and June 20, 2020.

521. As a result of this intentional discrimination by DEFENDANT SPARKS POLICE DEPARTMENT, in violation of Title II, PLAINTIFF was excluded from equal access to programs and services meant to ameliorate her disability.

522. As a result of this intentional discrimination by DEFENDANT SPARKS POLICE DEPARTMENT, in violation of Title II, PLAINTIFF was profiled on June 14, 2020 by OFFICER PATTERSON as being "unstable" simply because PLAINTIFF had protected herself from a battery.

523. If OFFICER PATTERSON truly believed PLAINTIFF to be "unstable," he should have offered mental health resources to her instead of criminalizing her.

524. By calling PLAINTIFF unstable, OFFICER PATTERSON was likely suggesting that PLAINTIFF needed a Legal 2000—a 72-hour civil commitment that functionally operates as if one were jailed—simply because she had defended herself from a battery by a man SPARKS POLICE DEPARTMENT routinely refer to on video as "a gentleman."

525. PLAINTIFF continues to be profiled by LAS VEGAS METROPOLITAN POLICE DEPARTMENT in that she is surveilled, followed, harassed, and has had her telecommunications intercepted, as pled elsewhere in this *First*

*Amended Complaint*; all of these actions by LAS VEGAS METROPOLITAN POLICE DEPARTMENT prey upon PLAINTIFF as a disabled American, a member of a protected class, at the same time that these actions also exacerbate and make worse PLAINTIFF'S disabilities.

526. PLAINTIFF seeks a permanent injunction requiring DEFENDANT SPARKS POLICE DEPARTMENT, WASHOE COUNTY JAIL, and LAS VEGAS METROPOLITAN POLICE DEPARTMENT to comply with the ADA in the future by ensuring that qualified individuals are not impermissibly profiled as criminal threats on the basis of their disabilities.

527. PLAINTIFF seeks a declaration that DEFENDANTS SPARKS POLICE DEPARTMENT, WASHOE COUNTY JAIL, and LAS VEGAS METROPOLITAN POLICE DEPARTMENT violated her rights under the ADA.

528. As a direct and proximate result of DEFENDANTS' intentional discrimination against her, PLAINTIFF sustained damages entitling her to equitable relief, as allowed by law, according to proof at trial.

529. Accordingly, PLAINTIFF is entitled to recover all available damages, including—but not limited to—punitive damages, if available, as allowed by law, in an amount to be determined at trial.

530. As a further, direct, and proximate result of DEFENDANTS' intentional discrimination against her, PLAINTIFF has had to retain the services of attorneys in this matter, for which she seeks reasonable attorneys' fees and costs, including under 42 U.S.C. § 12205 and 36 C.F.R §36.505.

//

//

//

//

## XIX.
## FIFTEENTH CLAIM FOR RELIEF

### Violation of PLAINTIFF'S Fourth Amendment Rights
### —*UNLAWFUL SEARCH AND SEIZURE*—

### (Asserted against DEFENDANTS SPARKS POLICE DEPARTMENT, LAS VEGAS METROPOLITAN POLICE DEPARTMENT, and DOE GOVERNMENT ENTITIES 4 THROUGH 10)

531. PLAINTIFF incorporates by reference all other allegations in this *Complaint*, as though fully set forth herein.

532. At all times relevant hereto, DEFENDANTS sued in this claim for relief (including by and through their agents and employees), and each of them, acting in their official and individual capacities, and acting under color of state law, caused the deprivation of PLAINTIFF'S federal rights, including her Fourth Amendment right to be free from unlawful search and seizure, as further alleged herein.

533. On June 14, 2020, PLAINTIFF had a reasonable expectation of privacy while walking around her neighborhood; she was not doing anything illegal by walking around her neighborhood.

534. On June 20, 2020, PLAINTIFF had a reasonable expectation of privacy while walking from her car to her apartment; she was not doing anything illegal by returning home.

535. After moving to Las Vegas, PLAINTIFF has had a reasonable expectation of privacy in: her property that was being transported by U-Haul, her home, the surveillance cameras set up within her home, and in the curtilage surrounding her home.

536. All of these reasonable expectations of privacy have been violated.

537. SPARKS POLICE DEPARTMENT violated PLAINTIFF'S reasonable

expectation of privacy when they detained her on June 14, 2020 as though she were a criminal suspect even after they were aware of a complaint that PLAINTIFF herself had filed against Saults and that SPARKS POLICE was obligated to investigate.

538. SPARKS POLICE DEPARTMENT violated PLAINTIFF'S reasonable expectation of privacy when they arrested her on June 20, 2020 for "stalking" when the extant video record that PLAINTIFF had given to SPARKS POLICE DEPARTMENT and that SPARKS POLICE DEPARTMENT had access to reflected that it was PLAINTIFF *herself* who had been battered and harassed, not the other way around.

539. SPARKS POLICE DEPARTMENT and LAS VEGAS METROPOLITAN POLICE DEPARTMENT, working in tandem, violated PLAINTIFF'S reasonable expectation of privacy in her property when they interfered with the transportation of her U-Haul shipment in the summer of 2021—interference that the company's own employee admitted to in a telephone call with PLAINTIFF.

540. SPARKS POLICE DEPARTMENT and LAS VEGAS METROPOLITAN POLICE DEPARTMENT, working in tandem, violated PLAINTIFF'S reasonable expectation of privacy when they released PLAINTIFF'S booking photo to her new employer in Las Vegas.

541. LAS VEGAS METROPOLITAN POLICE DEPARTMENT has violated PLAINTIFF'S reasonable expectation of privacy in her home by surveilling her and/or her property:

a. While her property was being transported by U-Haul from Northern to Southern Nevada.

b. At the Airbnb she temporarily occupied when first moving to Las Vegas;

c. At her current apartment;
d. Behind her car when she leaves her apartment;
e. Through her telecommunications devices and connections, such as by intercepting and paying for the T-Mobile internet connection PLAINTIFF uses at home.

542. LAS VEGAS METROPOLITAN POLICE DEPARTMENT has violated PLAINTIFF'S reasonable expectation of privacy in her home by knocking aggressively on her front door as though she is wanted for a crime.

543. LAS VEGAS METROPOLITAN POLICE DEPARTMENT has violated PLAINTIFF'S reasonable expectation of privacy in the curtilage surrounding her home by waiting outside her apartment when she comes home at night for no known reason.

544. Someone has, on information and belief, violated PLAINTIFF'S reasonable expectation of privacy in her home by using their control of her internet connection to "skim" videos from PLAINTIFF'S own security cameras.

545. Accordingly, PLAINTIFF is entitled to recover all available damages, including—but not limited to—punitive damages, if available, as allowed by law, in an amount to be determined at trial.

546. As a further result of the culpable conduct of the DEFENDANTS, as alleged in this cause of action, PLAINTIFF has had to retain the services of attorneys in this matter, for which she seeks costs and reasonable attorneys' fees.

//
//
//
//
//
//

## XX.
## SIXTEENTH CLAIM FOR RELIEF

### 42 U.S.C. § 1983 Violation of PLAINTIFF'S Fourth Amendment Rights
### —*UNLAWFUL SEARCH AND SEIZURE*—

**(Asserted against DEFENDANTS SPARKS POLICE OFFICERS Doe JONES, Doe PATTERSON, GINGER MILLER, and SPARKS POLICE OFFICER DOE 1, and DOE INDIVIDUALS 6 THROUGH 50)**

547. PLAINTIFF incorporates by reference all other allegations in this *Complaint*, as though fully set forth herein.

548. At all times relevant hereto, DEFENDANTS sued in this claim for relief (including by and through their agents and employees), and each of them, acting in their official and individual capacities, and acting under color of state law, caused the deprivation of PLAINTIFF'S federal rights, including her Fourth Amendment right to be free from unlawful search and seizure, as further alleged herein.

549. 42 U.S.C. § 1983 finds liability in individual state actors who, "under color of" law, deprive individuals of rights, privileges and immunities secured by the Constitution and laws.

550. Detaining anyone under suspicion of criminal activity requires "specific, objective facts establishing reasonable suspicion to believe the suspect was involved in criminal activity." *Hiibel v. Sixth Jud. Dist. Ct. of Nev., Humboldt Cty*, 542 U.S. 177, 184 (2004).

551. A police officer's racist and sexist bias toward an African-American woman is not reasonable suspicion.

552. On June 14, 2020, PLAINTIFF gave OFFICERS PATTERSON and JONES absolutely no cause to suspect that PLAINTIFF was involved in criminal activity as she walked peacefully through her neighborhood.

553. PLAINTIFF had a reasonable expectation of privacy not to be stopped and

searched during her walk since she was not doing anything illegal by walking.

554. Probable cause is "that line [which] draws a meaningful distinction between an officer's mere inkling and the presence of facts within the officer's personal knowledge which would convince a reasonable man that the person seized has committed, is committing, or is about to commit a particular crime." *Terry v. Ohio*, 392 U.S. 1, 38 (1968); in Nevada, "probable cause is a standard of reasonableness which must be interpreted in a common-sense and realistic manner." *Azbill v. State*, 84 Nev. 345, 358 (Nev. 1968).

555. A police officer's racist and sexist bias toward an African-American woman is not probable cause.

556. DEFENDANTS had no valid warrant, no reasonable suspicion, and no probable cause to detain PLAINTIFF.

557. Further, OFFICERS PATTERSON and JONES did not have any good faith in detaining PLAINTIFF in that they had no probable cause to detain and arrest PLAINTIFF; the OFFICERS' motivation was animus toward the disabled, toward women, and toward African-Americans.

558. There was no emergency circumstance present upon these facts; OFFICERS PATTERSON and JONES did not have probable cause that PLAINTIFF had committed a crime or imminently would commit one.

559. It was PLAINTIFF who had been attacked by Saults, but OFFICERS PATTERSON and JONES clearly viewed PLAINTIFF herself as the criminal suspect, as is detailed in the body cam videos that have been painstakingly transcribed in the fact section of this *First Amended Complaint.*

560. Further, OFFICERS PATTERSON and JONES were not in hot pursuit of PLAINTIFF.

561. There was no evidence that needed to be preserved in this case and OFFICERS PATTERSON and JONES were not in any danger from

PLAINTIFF.

562. When PLAINTIFF was wrongfully arrested for "stalking" the man who had battered her, OFFICER GINGER MILLER and SPARKS POLICE OFFICER DOE 1, this seizure violated her Fourth Amendment civil rights.

563. At the time of her arrest, PLAINTIFF had filed two different police reports with SPARKS POLICE DEPARTMENT regarding her battery by Saults, neither of which SPARKS POLICE DEPARTMENT meaningfully investigated.

564. Instead, OFFICERS MILLER and DOE hunted PLAINTIFF as the suspect.

565. OFFICER MILLER admits to this when she states on the body cam video "I've been looking for her for awhile."

566. Once having seized PLAINTIFF, OFFICERS MILLER and DOE rifled through and searched her things; this search included flipping through the cards in PLAINTIFF'S wallet.

567. It is not clear what proof of stalking OFFICER MILLER hoped to find in PLAINTIFF'S wallet.

568. Nevertheless, on the video, OFFICER MILLER nods her head in a confirmatory gesture, as if to suggest that the wallet did contain some justification for PLAINTIFF'S unlawful search and seizure.

569. OFFICER GINGER MILLER and SPARKS POLICE OFFICER DOE 1 had ample video evidence that PLAINTIFF had submitted to SPARKS POLICE DEPARTMENT showing that PLAINTIFF had pepper-sprayed Saults in self-defense when he began to batter her.

570. Nonetheless, OFFICER GINGER MILLER and SPARKS POLICE OFFICER DOE 1 prosecuted the situation as if they had probable cause, instead, to arrest PLAINTIFF, the victim.

571. PLAINTIFF'S arrest therefore violated her civil right to be free from

unlawful search and seizure as enshrined within the Fourth Amendment to the U.S. Constitution.

572. Accordingly, PLAINTIFF is entitled to recover all available damages, including—but not limited to—punitive damages, if available, as allowed by law, in an amount to be determined at trial.

573. As a further result of the culpable conduct of the DEFENDANTS, as alleged in this cause of action, PLAINTIFF has had to retain the services of attorneys in this matter, for which she seeks costs and reasonable attorneys' fees.

## XXI.
## SEVENTEENTH CLAIM FOR RELIEF

### Violation of PLAINTIFF'S Eighth Amendment Rights
### —*CRUEL AND UNUSUAL PUNISHMENT*—

**(Asserted against WASHOE COUNTY JAIL and DOE GOVERNMENT ENTITIES 4 THROUGH 10)**

574. PLAINTIFF incorporates by reference all other allegations in this *Complaint*, as though fully set forth herein.

575. At all times relevant hereto, DEFENDANTS sued in this claim for relief (including by and through their agents and employees), and each of them, acting in their official and individual capacities, and acting under color of state law, caused the deprivation of PLAINTIFF'S federal rights, including her Eighth Amendment right to be free from cruel and unusual punishment, as further alleged herein.

576. During the course of PLAINTIFF'S jailing in WASHOE COUNTY JAIL she was placed in solitary confinement for no known reason.

577. PLAINTIFF did not present a security threat to the rest of the prison population.

578. PLAINTIFF had no prior criminal history.

579. The reasons for PLAINTIFF having been placed in solitary confinement remain unclear.

580. Such placement in solitary confinement constituted cruel and unusual punishment, and use of excessive force, by WASHOE COUNTY JAIL.

581. Some of PLAINTIFF'S property like her clothing was lost during her jailing; when PLAINTIFF left the jail, she had to wear borrowed clothes.

582. PLAINTIFF developed a very painful skin condition—Hidradenitis suppurativa—directly as a result of her jailing.

583. Accordingly, PLAINTIFF is entitled to recover all available damages, including—but not limited to—punitive damages, if available, as allowed by law, in an amount to be determined at trial.

584. As a further result of the culpable conduct of the DEFENDANTS, as alleged in this cause of action, PLAINTIFF has had to retain the services of attorneys in this matter, for which she seeks costs and reasonable attorneys' fees.

## XXII.
## EIGHTEENTH CLAIM FOR RELIEF

### 42 U.S.C. § 1983 Violation of PLAINTIFF'S Eighth Amendment Rights — *CRUEL AND UNUSUAL PUNISHMENT* —

### (Asserted against DOE CORRECTIONS OFFICER(S) FOR WASHOE COUNTY JAIL and DOE INDIVIDUALS 6 THROUGH 50)

585. PLAINTIFF incorporates by reference all other allegations in this *Complaint*, as though fully set forth herein.

586. At all times relevant hereto, DEFENDANTS sued in this claim for relief (including by and through their agents and employees), and each of them, acting in their official and individual capacities, and acting under color of state law,

caused the deprivation of PLAINTIFF'S federal rights, including her Eighth Amendment right to be free from cruel and unusual punishment, as further alleged herein.

587. During the course of PLAINTIFF'S jailing in WASHOE COUNTY JAIL she was placed in solitary confinement by DOE CORRECTIONS OFFICER(S) FOR WASHOE COUNTY JAIL for no known reason.

588. PLAINTIFF did not present a security threat to the rest of the prison population.

589. PLAINTIFF had no prior criminal history.

590. The reasons for PLAINTIFF having been placed in solitary confinement remain unclear.

591. Such placement in solitary confinement constituted cruel and unusual punishment, and use of excessive force, by DOE CORRECTIONS OFFICER(S) FOR WASHOE COUNTY JAIL.

592. Some of PLAINTIFF'S property like her clothing was lost by DOE CORRECTIONS OFFICER(S) FOR WASHOE COUNTY JAIL during her jailing; when PLAINTIFF left the jail, she had to wear borrowed clothes.

593. PLAINTIFF developed a very painful skin condition—Hidradenitis suppurativa—directly as a result of her jailing.

594. Accordingly, PLAINTIFF is entitled to recover all available damages, including—but not limited to—punitive damages, if available, as allowed by law, in an amount to be determined at trial.

595. As a further result of the culpable conduct of the DEFENDANTS, as alleged in this cause of action, PLAINTIFF has had to retain the services of attorneys in this matter, for which she seeks costs and reasonable attorneys' fees.

//

//

## XXIII.
## NINETEENTH CLAIM FOR RELIEF

### Violation of PLAINTIFF'S Fourteenth Amendment Rights
### —*SUBSTANTIVE AND PROCEDURAL DUE PROCESS*—

### (Asserted against DEFENDANTS SPARKS POLICE DEPARTMENT, WASHOE COUNTY JAIL, LAS VEGAS METROPOLITAN POLICE DEPARTMENT, and DOE GOVERNMENT ENTITIES 4 THROUGH 10)

596. PLAINTIFF incorporates by reference all other allegations in this *Complaint*, as though fully set forth herein.

597. At all times relevant hereto, DEFENDANTS sued in this claim for relief (including by and through their agents and employees), and each of them, acting in their official and individual capacities, and acting under color of state law, caused the deprivation of PLAINTIFF'S federal rights, including her Fourteenth Amendment right to due process, as further alleged herein.

598. The actions of DEFENDANTS SPARKS POLICE DEPARTMENT and LAS VEGAS METROPOLITAN POLICE DEPARTMENT toward PLAINTIFF have deprived Plaintiff of her right to liberty and due process.

599. At all points subsequent to her battery by Saults, PLAINTIFF was treated as the criminal; she was never given a fair opportunity to be heard by SPARKS POLICE DEPARTMENT before they detained and ultimately arrested her.

600. SPARKS POLICE DEPARTMENT callously disregarded the video evidence PLAINTIFF had provided to them, which clearly showed her being attacked by Saults.

601. SPARKS POLICE DEPARTMENT refused to investigate PLAINTIFF'S two complaints regarding the incident with Saults.

602. On the body cam videos painstakingly transcribed in the facts section of this *First Amended Complaint*, OFFICER JONES first condescends to PLAINTIFF that she did not make a complaint.

603. Then, after investigating the complaint numbers that JONES is given by PLAINTIFF, he concludes verbally that no battery occurred.

604. These statements by SPARKS POLICE DEPARTMENT prove that the DEPARTMENT had already decided that PLAINTIFF'S complaint was not worth pursuing.

605. This conclusion is supported by the fact that, on June 20, 2020, OFFICER MILLER admits to her DOE partner that she has been looking for PLAINTIFF for a "long time."

606. There were only five days between PLAINTIFF'S unlawful detainment by OFFICERS JONES and PATTERSON and PLAINTIFF's unlawful arrest by OFFICER MILLER, so MILLER's comments suggest that, for that entire time, PLAINTIFF was viewed as a criminal suspect, not a victim.

607. OFFICER JONES and PATTERSON'S comments and behavior, detailed above, also strongly suggest that, on June 14, 2020, PLAINTIFF was viewed as a criminal suspect, not a victim.

608. Such negligence and tortious conduct in the way that PLAINTIFF was treated despite herself having made a complaint about Saults to the SPARKS POLICE DEPARTMENT suggests that the DEPARTMENT fundamentally deprived PLAINTIFF of substantive and procedural due process as a citizen.

609. Since the time of her battery by Saults, there has been no legitimate government interest in the way that DEFENDANTS have treated PLAINTIFF; their detainment, arrest, and subsequent surveillance and harassment of PLAINTIFF has been enacted for personal animus, not because of any public need that PLAINTIFF should be detained, arrested, or surveilled.

610. PLAINTIFF'S arrest by SPARKS POLICE DEPARTMENT violated PLAINTIFF'S civil right to be afforded substantive and procedural due process as enshrined within the Fourteenth Amendment to the U.S. Constitution.

611. PLAINTIFF'S jailing by WASHOE COUNTY JAIL violated PLAINTIFF'S civil right to be afforded substantive and procedural due process as enshrined within the Fourteenth Amendment to the U.S. Constitution.

612. As detailed *supra*, PLAINTIFF is subject to ongoing harassment and surveillance by LAS VEGAS METROPOLITAN POLICE DEPARTMENT despite having paid her "debt" to society in the form of her jailing in June 2020.

613. PLAINTIFF has been denied the procedural and substantive due process of knowing why she is still subject to ongoing harassment and surveillance by LAS VEGAS METROPOLITAN POLICE DEPARTMENT.

614. PLAINTIFF'S subsequent ongoing harassment and surveillance by LAS VEGAS METROPOLITAN POLICE DEPARTMENT violates PLAINTIFF'S civil right to be afforded substantive and procedural due process as enshrined within the Fourteenth Amendment to the U.S. Constitution.

615. Accordingly, PLAINTIFF is entitled to recover all available damages, including—but not limited to—punitive damages, if available, as allowed by law, in an amount to be determined at trial.

616. As a further result of the culpable conduct of the DEFENDANTS, as alleged in this cause of action, PLAINTIFF has had to retain the services of attorneys in this matter, for which she seeks costs and reasonable attorneys' fees.

//
//
//
//
//
//
//
//

## XXIV.
## TWENTIETH CLAIM FOR RELIEF
## 42 U.S.C. § 1983 Violation of PLAINTIFF'S Fourteenth Amendment Rights
## —*SUBSTANTIVE AND PROCEDURAL DUE PROCESS*—

**(Asserted against DEFENDANTS SPARKS POLICE OFFICERS Doe JONES, Doe PATTERSON, GINGER MILLER, and SPARKS POLICE OFFICER DOE 1, DOE CORRECTIONS OFFICER(S) FOR WASHOE COUNTY JAIL, and DOE INDIVIDUALS 6 THROUGH 50)**

617. PLAINTIFF incorporates by reference all other allegations in this *Complaint*, as though fully set forth herein.

618. At all times relevant hereto, DEFENDANTS sued in this claim for relief (including by and through their agents and employees), and each of them, acting in their official and individual capacities, and acting under color of state law, caused the deprivation of PLAINTIFF'S federal rights, including her Fourteenth Amendment right to due process, as further alleged herein.

619. 42 U.S.C. § 1983 finds liability in individual state actors who, "under color of" law, deprive individuals of rights, privileges and immunities secured by the Constitution and laws.

620. The actions of the above-named state actors DEFENDANTS have deprived Plaintiff of her right to liberty and due process.

621. At all points subsequent to her battery by Saults, PLAINTIFF was treated as the aggressor; she was never given a fair opportunity to be heard by OFFICERS JONES, PATTERSON, MILLER, and SPARKS POLICE OFFICER DOE 1 before they detained and ultimately arrested her.

622. The OFFICERS of SPARKS POLICE DEPARTMENT callously disregarded the video evidence that PLAINTIFF had provided to them, which clearly showed her being attacked by Saults.

623. These OFFICERS refused to investigate PLAINTIFF'S two complaints regarding the incident with Saults.

624. Thus, OFFICERS PATTERSON and JONES thought nothing of detaining PLAINTIFF on June 14, 2020 as though she was a criminal suspect.

625. On the body cam videos painstakingly transcribed in the facts section of this *First Amended Complaint*, OFFICER JONES first condescends to PLAINTIFF that she did not make a complaint.

626. Then, after investigating the complaint numbers that JONES is given by PLAINTIFF, he concludes verbally that no battery occurred.

627. These statements by officers working for SPARKS POLICE DEPARTMENT prove that the DEPARTMENT had already decided that PLAINTIFF'S complaint was not worth pursuing.

628. This conclusion is supported by the fact that, on June 20, 2020, OFFICER MILLER admits to her DOE partner that she has been looking for PLAINTIFF "for awhile."

629. There were only five days between PLAINTIFF'S unlawful detainment by OFFICERS JONES and PATTERSON and PLAINTIFF's unlawful arrest by OFFICER MILLER, so MILLER's comment suggests that, for that entire time, PLAINTIFF was viewed as a criminal suspect, not a victim.

630. OFFICER JONES and PATTERSON'S comments and behavior, detailed above, also strongly suggest that, on June 14, 2020, PLAINTIFF was viewed as a criminal suspect, not a victim.

631. Such negligence and tortious conduct in the way that PLAINTIFF was treated despite herself having made a complaint about Saults to the SPARKS POLICE DEPARTMENT suggests that these OFFICERS fundamentally deprived PLAINTIFF of substantive and procedural due process as a citizen.

632. Why the SPARKS POLICE DEPARTMENT OFFICERS so deprived PLAINTIFF of her substantive and procedural due process rights under the Fourteenth Amendment remains to be proven at trial, but, on information and

belief, they treated PLAINTIFF differently because she is African-American and female and her assailant is white and male.

633. OFFICER PATTERSON also concluded that PLAINTIFF could not be a victim because she was, in his words, "unstable."

634. Since the time of her battery by Saults, there has been no legitimate government interest in the way that DEFENDANTS have treated PLAINTIFF; their detainment, arrest, and subsequent surveillance and harassment of PLAINTIFF has been enacted for personal animus, not because of any public need that PLAINTIFF should be detained, arrested, or surveilled.

635. PLAINTIFF'S arrest by SPARKS POLICE DEPARTMENT OFFICERS violated PLAINTIFF'S civil right to be afforded substantive and procedural due process as enshrined within the Fourteenth Amendment to the U.S. Constitution.

636. PLAINTIFF'S subsequent ongoing harassment and surveillance by OFFICERS working for LAS VEGAS METROPOLITAN POLICE DEPARTMENT violates PLAINTIFF'S civil right to be afforded substantive and procedural due process as enshrined within the Fourteenth Amendment to the U.S. Constitution.

637. As detailed *supra*, PLAINTIFF is subject to ongoing harassment and surveillance by DOE OFFICERS working for LAS VEGAS METROPOLITAN POLICE DEPARTMENT despite having paid her "debt" to society in the form of her jailing in June 2020.

638. PLAINTIFF has been denied the procedural and substantive due process of knowing why she is still subject to ongoing harassment and surveillance by DOE OFFICERS working for LAS VEGAS METROPOLITAN POLICE DEPARTMENT.

639. Accordingly, PLAINTIFF is entitled to recover all available damages,

including—but not limited to—punitive damages, if available, as allowed by law, in an amount to be determined at trial.

640. As a further result of the culpable conduct of the DEFENDANTS, as alleged in this cause of action, PLAINTIFF has had to retain the services of attorneys in this matter, for which she seeks costs and reasonable attorneys' fees.

## XXV.
## TWENTY-FIRST CLAIM FOR RELIEF

### Violation of PLAINTIFF'S Fourteenth Amendment Rights
### —*EQUAL PROTECTION*—

**(Asserted against DEFENDANTS SPARKS POLICE DEPARTMENT, WASHOE COUNTY JAIL, LAS VEGAS METROPOLITAN POLICE DEPARTMENT, and DOE GOVERNMENT ENTITIES 4 THROUGH 10)**

641. PLAINTIFF incorporates by reference all other allegations in this *Complaint*, as though fully set forth herein.

642. At all times relevant hereto, DEFENDANTS sued in this claim for relief (including by and through their agents and employees), and each of them, acting in their official and individual capacities, and acting under color of state law, caused the deprivation of PLAINTIFF'S federal rights, including her Fourteenth Amendment right to equal protection, as further alleged herein.

643. PLAINTIFF is female, she is disabled by reasons of physical and mental health conditions, and she is also African-American.

644. PLAINTIFF therefore belongs to multiple protected classes as conceived by Constitutional law and by the Americans with Disabilities Act.

645. During the incident, PLAINTIFF was wrongfully profiled, wrongly detained, battered, and falsely imprisoned.

646. At all times, the DEFENDANTS sued in this Cause of Action were on notice that PLAINTIFF belonged to at least one if not multiple protected classes—

female, African-American, and disabled—that deserve the equal protection of the laws.

647. When the DEFENDANTS sued in this Cause of Action detained, arrested, jailed, and surveilled PLAINTIFF on behalf of the state, their actions were not rationally related to the legitimate government interest of protecting the public from harm; rather, their actions were as a result of discriminatory animus toward women, African-Americans, and the disabled.

648. It is not in the public interest for SPARKS POLICE DEPARTMENT, WASHOE COUNTY JAIL, and LAS VEGAS METROPOLITAN POLICE DEPARTMENT to target, imprison, and surveil Black women with disabilities who are violently attacked by old, white men.

649. As such, the behavior of SPARKS POLICE DEPARTMENT, WASHOE COUNTY JAIL, and LAS VEGAS METROPOLITAN POLICE DEPARTMENT is not rationally related to any legitimate government interest.

650. PLAINTIFF'S arrest therefore violated her civil right to be afforded equal protection as enshrined within the Fourteenth Amendment to the U.S. Constitution.

651. Accordingly, PLAINTIFF is entitled to recover all available damages, including—but not limited to—punitive damages, if available, as allowed by law, in an amount to be determined at trial.

652. As a further result of the culpable conduct of the DEFENDANTS, as alleged in this cause of action, PLAINTIFF has had to retain the services of attorneys in this matter, for which she seeks costs and reasonable attorneys' fees.

//

//

//

//

## XXVI.
## TWENTY-SECOND CLAIM FOR RELIEF

### 42 U.S.C. § 1983 Violation of PLAINTIFF'S Fourteenth Amendment Rights —*EQUAL PROTECTION*—

### (Asserted against DEFENDANTS SPARKS POLICE OFFICERS Doe JONES, Doe PATTERSON, GINGER MILLER, and SPARKS POLICE OFFICER DOE 1, DOE CORRECTIONS OFFICER(S) FOR WASHOE COUNTY JAIL and DOE INDIVIDUALS 6 THROUGH 50)

653. PLAINTIFF incorporates by reference all other allegations in this *Complaint*, as though fully set forth herein.

654. At all times relevant hereto, DEFENDANTS sued in this claim for relief (including by and through their agents and employees), and each of them, acting in their official and individual capacities, and acting under color of state law, caused the deprivation of PLAINTIFF'S federal rights, including her Fourteenth Amendment right to equal protection, as further alleged herein.

655. 42 U.S.C. § 1983 finds liability in individual state actors who, "under color of" law, deprive individuals of rights, privileges and immunities secured by the Constitution and laws.

656. PLAINTIFF is female, she is disabled by reasons of physical and mental health conditions, and she is also African-American.

657. PLAINTIFF therefore belongs to multiple protected classes as conceived by Constitutional law and by the Americans with Disabilities Act.

658. During the incident, PLAINTIFF was wrongfully profiled, wrongly detained, battered, and falsely imprisoned.

659. At all times, the DEFENDANTS sued in this Cause of Action were on notice that PLAINTIFF belonged to at least one if not multiple protected classes—African-American and disabled—that deserve the equal protection of the laws.

660. When the DEFENDANTS sued in this Cause of Action detained, arrested,

jailed, and surveilled PLAINTIFF on behalf of the state, their actions were not rationally related to the legitimate government interest of protecting the public from harm; rather, their actions were as a result of discriminatory animus toward women, African-Americans, and the disabled.

661. It is not in the public interest for SPARKS POLICE OFFICERS Doe JONES, Doe PATTERSON, GINGER MILLER, SPARKS POLICE OFFICER DOE 1, and DOE CORRECTIONS OFFICER(S) FOR WASHOE COUNTY JAIL to target, imprison, and surveil Black women with disabilities who are violently attacked by old, white men.

662. As such, the behavior of SPARKS POLICE OFFICERS Doe JONES, Doe PATTERSON, GINGER MILLER, SPARKS POLICE OFFICER DOE 1, and DOE CORRECTIONS OFFICER(S) FOR WASHOE COUNTY JAIL is not rationally related to any legitimate government interest.

663. PLAINTIFF'S arrest therefore violated her civil right to be afforded equal protection as enshrined within the Fourteenth Amendment to the U.S. Constitution.

664. Accordingly, PLAINTIFF is entitled to recover all available damages, including—but not limited to—punitive damages, if available, as allowed by law, in an amount to be determined at trial.

665. As a further result of the culpable conduct of the DEFENDANTS, as alleged in this cause of action, PLAINTIFF has had to retain the services of attorneys in this matter, for which she seeks costs and reasonable attorneys' fees.

//

//

//

//

//

## XXVII.
## TWENTY-THIRD CLAIM FOR RELIEF

### 42 U.S.C. § 1981 Impairment of PLAINTIFF'S Equal Rights Under Color of State Law
### —*PROTECTION FROM DISCRIMINATION ON THE BASIS OF RACE*—

### (Asserted Against ALL DEFENDANTS)

666. PLAINTIFF incorporates by reference all other allegations in this *Complaint*, as though fully set forth herein.

667. PLAINTIFF is African-American.

668. During the incidents described above, PLAINTIFF was wrongfully detained, falsely imprisoned, and ultimately kidnapped from the courtyard of her apartment building.

669. Throughout this entire ordeal, DEFENDANTS JONES, PATTERSON, and MILLER were on notice that PLAINTIFF is African-American.

670. When DEFENDANTS JONES, PATTERSON, and MILLER arrested PLAINTIFF on behalf of the state, their actions were not rationally related to the legitimate government interest of protecting the public from harm; rather, their actions were as a result of discriminatory animus toward African-Americans.

671. It is not in the public interest for the SPARKS POLICE DEPARTMENT, WASHOE COUNTY JAIL, the LAS VEGAS METROPOLITAN POLICE DEPARTMENT and their OFFICERS, acting under color of law, to target individuals on the basis of their race.

672. As such, the behavior of DEFENDANTS is not rationally related to any legitimate government interest.

673. PLAINTIFF'S arrest therefore violated her civil right not to have her rights impaired on the basis of race as enshrined at section 1981 of Chapter 42 of the

U.S. Code.

674. "There is no statutory cap on damage awards available for § 1981 claims." *Pavon v. Swift Transp. Co., Inc.*, 192 F.3d 902, 910 n.2 (9th Cir. 1999). Accordingly, PLAINTIFF is entitled to recover all available damages, including—but not limited to—punitive damages, if available, as allowed by law, in an amount to be determined at trial.

675. As a further result of the culpable conduct of the DEFENDANTS, as alleged in this cause of action, PLAINTIFF has had to retain the services of attorneys in this matter, for which she seeks costs and reasonable attorneys' fees.

## XXVIII.
## TWENTY-FOURTH CLAIM FOR RELIEF

### 18 U.S.C. §§ 2510-2523 Violations of the Electronic Communications Privacy Act of 1986 (ECPA)

**(Asserted against DEFENDANTS SPARKS POLICE DEPARTMENT, LAS VEGAS METROPOLITAN POLICE DEPARTMENT, and DOE GOVERNMENT ENTITIES 4 THROUGH 10)**

676. PLAINTIFF incorporates by reference all other allegations in this *Complaint*, as though fully set forth herein.

677. Under 18 U.S.C. § 2511 ("interception and disclosure of wire, oral, or electronic communications prohibited"), it is illegal for local law enforcement to intercept a private citizen's telecommunications without a warrant.

678. PLAINTIFF routinely finds that when she gets a new telephone number whose identity she conceals, for some reason, that number suddenly begins to receive texts from unknown places.

679. When she opens a new e-mail account, that account begins to receive spam from unknown places.

680. Money for PLAINTIFF'S T-Mobile bill for WiFi has not been debited from

her checking account for six months; nevertheless, the service remains on and working.

681. When PLAINTIFF e-mailed T-Mobile to inquire about this billing irregularity, she received an out-of-the-office reply.

682. When PLAINTIFF called T-Mobile to inquire about this billing irregularity, she was told directly that the police were paying for the account. Then, the line went dead.

683. PLAINTIFF believes that there is no use in changing carriers, because she will simply be followed by the POLICE to whatever telecommunications provider she chooses.

684. Just recently, the property managers at PLAINTIFF'S apartment building used video skimmed from PLAINTIFF'S *own* surveillance cameras, operating on PLAINTIFF'S *own* WiFi connection, to try to cite PLAINTIFF for a perceived violation of a community standard, leaving the reasonable observer to question how PLAINTIFF'S property managers came to acquire access to this video.

685. The facts of this case support the inference that PLAINTIFF'S telecommunications are monitored by local law enforcement working in partnership with community members.

686. If such monitoring is taking place without a warrant, it is likely illegal for the following reasons including, but not limited to:

a. PLAINTIFF presents no threat to national security.
b. PLAINTIFF is not a spy working for a foreign government.
c. PLAINTIFF is not of interest to federal law enforcement.
d. Local law enforcement in Clark County has no reasonable suspicion that PLAINTIFF has committed a crime.
e. Local law enforcement in Clark County has no probable cause that

PLAINTIFF has committed a crime.

f. Local law enforcement in Clark County has no published warrant for PLAINTIFF'S arrest.

687. In fact, PLAINTIFF is just a single, Black woman who works at night to support her elderly mother.

688. Accordingly, PLAINTIFF is entitled to recover all available damages, including—but not limited to—punitive damages, if available, as allowed by law, in an amount to be determined at trial.

689. As a further result of the culpable conduct of the DEFENDANTS, as alleged in this cause of action, PLAINTIFF has had to retain the services of attorneys in this matter, for which she seeks costs and reasonable attorneys' fees.

## *—THEORIES OF LIABILITY APPLICABLE TO ALL CLAIMS—*

## XXIX.

### *Respondeat Superior Liability*[4]

### *Vicarious Liability of Employers for Conduct by Their Employees, Occurring in the Course and Scope of Employment*

**(Asserted against DEFENDANTS SPARKS POLICE DEPARTMENT, WASHOE COUNTY JAIL, LAS VEGAS METROPOLITAN POLICE**

[4] *Respondeat superior* is not properly a cause of action or a claim for relief, but rather, a method of assigning liability to an employer for the conduct of its employees. See *Fernandez v. Penske Truck Leasing Co., L.P.* 2021 WL 1832571, 1 (D. Nev. 2012) (citing *Cruz v. Durbin*, 2011 WL 1792765 (D. Nev. 2011)). Accordingly, this section is not labeled as a claim for relief, but it seeks to assign liability to DEFENDANTS SPARKS POLICE DEPARTMENT, WASHOE COUNTY JAIL, LAS VEGAS METROPOLITAN POLICE DEPARTMENT and DOE GOVERNMENT ENTITIES 4 through10, vicariously, for the acts of their employees, including OFFICERS MILLER, PATTERSON, JONES, SPARKS POLICE OFFICER DOE 1, DOE CORRECTIONS OFFICER(S) FOR WASHOE COUNTY JAIL, and DOE INDIVIDUALS 6 through 50.

**DEPARTMENT, and DOE GOVERNMENT ENTITIES 4 through 10)**

690. PLAINTIFF incorporates by reference all other allegations in this *Complaint*, as though fully set forth herein.

691. At all relevant times herein, OFFICERS MILLER, PATTERSON, JONES, and SPARKS POLICE OFFICER DOE 1, DOE CORRECTIONS OFFICER(S) FOR WASHOE COUNTY JAIL, and DOE INDIVIDUALS 6 THROUGH 50, and each of them, were under the control of their respective employers, including DEFENDANTS SPARKS POLICE DEPARTMENT, WASHOE COUNTY JAIL, LAS VEGAS METROPOLITAN POLICE DEPARTMENT, and DOE GOVERNMENT ENTITIES 4 through 10.

692. At all relevant times herein, the acts of OFFICERS MILLER, PATTERSON, JONES, and SPARKS POLICE OFFICER DOE 1, DOE CORRECTIONS OFFICER(S) FOR WASHOE COUNTY JAIL, and DOE INDIVIDUALS 6 THROUGH 50, and each of them, complained of herein, caused injury and harm to PLAINTIFF and created culpability for violating the law, as alleged herein.

693. At all relevant times herein, the culpable and injurious acts of OFFICERS MILLER, PATTERSON, JONES, and SPARKS POLICE OFFICER DOE 1, DOE CORRECTIONS OFFICER(S) FOR WASHOE COUNTY JAIL, and DOE INDIVIDUALS 6 THROUGH 50, and each of them, occurred when they were under the control of their respective employers, DEFENDANTS SPARKS POLICE DEPARTMENT, WASHOE COUNTY JAIL, LAS VEGAS METROPOLITAN POLICE DEPARTMENT, and DOE GOVERNMENT ENTITIES 4 through 10, and such acts by these employees occurred within the course and scope of their employment.

694. Based on the foregoing, PLAINTIFF is entitled to invoke the doctrine of *respondeat superior* to impose vicarious liability on DEFENDANTS SPARKS

POLICE DEPARTMENT, WASHOE COUNTY JAIL, LAS VEGAS METROPOLITAN POLICE DEPARTMENT, and DOE GOVERNMENT ENTITIES 4 through 10 as respective employers of OFFICERS MILLER, PATTERSON, JONES, and SPARKS POLICE OFFICER DOE 1, DOE CORRECTIONS OFFICER(S) FOR WASHOE COUNTY JAIL, and DOE INDIVIDUALS 6 THROUGH 50 for the culpable conduct of these employees occurring within the course and scope of their employment.

**XXX.**

***Negligent Hiring and Entrustment*[5]**

***Vicarious Liability of Employers for Hiring Bad Employees and Entrusting Sensitive Tasks to Employees not Able to Carry Them Out***

**(Asserted against DEFENDANTS SPARKS POLICE DEPARTMENT, WASHOE COUNTY JAIL, LAS VEGAS METROPOLITAN POLICE DEPARTMENT, and DOE GOVERNMENT ENTITIES 4 through 10)**

695. PLAINTIFF incorporates by reference all other allegations in this *Complaint*, as though fully set forth herein.

696. DEFENDANTS SPARKS POLICE DEPARTMENT, WASHOE COUNTY JAIL, LAS VEGAS METROPOLITAN POLICE DEPARTMENT, and DOE

---

[5] Negligent hiring and entrustment are not properly causes of action or claims for relief, but rather, methods of assigning liability to an employer for the conduct of its employees. To state a claim for negligent training and supervision in Nevada, the Plaintiff must show "(1) a general duty on the employer to use reasonable care in the training and/or supervision of employees to ensure that they are fit for their positions; (2) breach; (3) injury; and (4) causation." *Okeke v, Biomat USA*, *Inc.*, 927 F. Supp. 2d 1021, 1028 (D. Nev. 2013) citing *Reece v. Republic Services, Inc.,* 2011 WL 868386, *11 (D. Nev. Mar. 10, 2011). Claims for negligent training and supervision are based upon the premise that an employer should be liable when it places an employee—who it knows or should have known behaves wrongfully—in a position in which the employee can harm someone else. *Id.* citing *Daisley v. Riggs Bank, N.A.,* 372 F.Supp.2d 61, 79 (D.D.C.2005).

GOVERNMENT ENTITIES 4 through 10 had a duty to PLAINTIFF and to the public to use reasonable care in the training and supervision of their police employees to ensure that they were fit for their positions, including by training police employees to discern the difference between the true victim and the true perpetrator of a crime and impermissible profiling on the basis of race, gender, and disability.

697. DEFENDANTS SPARKS POLICE DEPARTMENT, WASHOE COUNTY JAIL, LAS VEGAS METROPOLITAN POLICE DEPARTMENT, and DOE GOVERNMENT ENTITIES 4 through 10 had a duty to PLAINTIFF and to the public to train their police officers regarding, but not limited to:

a. Recognizing and understanding animal control laws regarding unleashed and unvaccinated dogs;
b. Recognizing and understanding when a battery has occurred;
c. Recognizing and understanding when a hate crime has occurred;
d. Recognizing and understanding what self-defense is and when its use is merited;
e. Recognizing and understanding the difference between genuine mental instability and the instinct that all people have to defend themselves against unwarranted attacks;
f. Recognizing and understanding that an individual cannot trespass when walking peacefully inside their own neighborhood;
g. Recognizing and understanding that carrying proper identification is required when driving but not when walking;
h. Recognizing and understanding what the crime of stalking is, legally;
i. Recognizing and understanding what the crime of trespass is, legally;
j. Recognizing and understanding what constitutes reasonable suspicion sufficient to detain;

k. Recognizing and understanding what constitutes probable cause sufficient to arrest;

l. Recognizing and understanding what cruel and unusual punishment are;

m. Recognizing and understanding what constitutes excessive use of force;

n. Recognizing and understanding how to de-escalate situations to prevent the need for the use of force;

o. Recognizing and understanding what constitutes impermissible bias and profiling on the basis of race;

p. Recognizing and understanding what constitutes impermissible bias and profiling on the basis of disability;

q. Recognizing and understanding what constitutes impermissible bias and profiling on the basis of gender;

r. Recognizing and understanding how to handle vulnerable Nevadans who are protected by NRS § 41.1395;

s. Recognizing and understanding that ongoing surveillance and harassment of private citizens is not in the public interest, certainly when those individuals are not formal criminal suspects;

t. Complying with the standards for search, seizure, and arrest as analyzed by the U.S. Supreme Court in cases such as *Terry v. Ohio* and *Hiibel v. Sixth Jud. Dist. Ct. of Nev., Humboldt Cty*, 542 U.S. 177, 184 (2004);

u. Complying with the Fourth, Eighth, and Fourteenth Amendments to the U.S. Constitution;

v. Complying with all federal laws regarding wiretapping and electronic communication interference.

698. On information and belief, at all times relevant hereto, DEFENDANTS SPARKS POLICE DEPARTMENT, WASHOE COUNTY JAIL, LAS VEGAS METROPOLITAN POLICE DEPARTMENT, and DOE GOVERNMENT ENTITIES 4 through 10 through their officers, managers, supervisors, agents, and/or employees, were responsible for training, supervising, and retaining employees, including training and supervision pertaining to OFFICERS MILLER, PATTERSON, JONES, and SPARKS POLICE OFFICER DOE 1, DOE CORRECTIONS OFFICER(S) FOR WASHOE COUNTY JAIL, and DOE INDIVIDUALS 6 THROUGH 50, and each of them.

699. On information and belief, at all times relevant hereto, DEFENDANTS SPARKS POLICE DEPARTMENT, WASHOE COUNTY JAIL, LAS VEGAS METROPOLITAN POLICE DEPARTMENT, and DOE GOVERNMENT ENTITIES 4 through 10 through their officers, managers, supervisors, agents, and/or employees, and each of them, owed a general duty to use reasonable care in the training, supervision, and retention of such employees, including OFFICERS MILLER, PATTERSON, JONES, and SPARKS POLICE OFFICER DOE 1, DOE CORRECTIONS OFFICER(S) FOR WASHOE COUNTY JAIL, and DOE INDIVIDUALS 6 THROUGH 50, and each of them, to make sure that their employees are fit for their positions and to prevent harm to third parties, including PLAINTIFF, by the employees' tortious or wrongful conduct, of the type alleged herein.

700. On information and belief, at all times relevant hereto, DEFENDANTS SPARKS POLICE DEPARTMENT, WASHOE COUNTY JAIL, LAS VEGAS METROPOLITAN POLICE DEPARTMENT, and DOE GOVERNMENT ENTITIES 4 through 10 through their officers, managers, supervisors, agents, and/or employees breached this duty of care when they

placed and retained OFFICERS MILLER, PATTERSON, JONES, and SPARKS POLICE OFFICER DOE 1, DOE CORRECTIONS OFFICER(S) FOR WASHOE COUNTY JAIL, and DOE INDIVIDUALS 6 THROUGH 50, and each of them, in their positions as police officers and corrections officers without properly training and supervising OFFICERS MILLER, PATTERSON, JONES, and SPARKS POLICE OFFICER DOE 1, DOE CORRECTIONS OFFICER(S) FOR WASHOE COUNTY JAIL, and DOE INDIVIDUALS 6 THROUGH 50, and each of them, whom they knew or should have known would fail to properly perform their duties, and that in the position in which they were placed and retained, OFFICERS MILLER, PATTERSON, JONES, and SPARKS POLICE OFFICER DOE 1, DOE CORRECTIONS OFFICER(S) FOR WASHOE COUNTY JAIL, and DOE INDIVIDUALS 6 THROUGH 50, and each of them, could harm someone innocent, including PLAINTIFF, as alleged herein.

701. On information and belief, DEFENDANTS SPARKS POLICE DEPARTMENT, WASHOE COUNTY JAIL, LAS VEGAS METROPOLITAN POLICE DEPARTMENT, and DOE GOVERNMENT ENTITIES 4 through 10 through their officers, managers, supervisors, agents, and/or employees were negligent in the training, supervision and retention of OFFICERS MILLER, PATTERSON, JONES, and SPARKS POLICE OFFICER DOE 1, DOE CORRECTIONS OFFICER(S) FOR WASHOE COUNTY JAIL, and DOE INDIVIDUALS 6 THROUGH 50, and each of them, including but not limited to training in the areas of: recognizing self-defense, recognizing trespass, racial bias, use of force, civil rights, de-escalation, and identifying the actual victims of crimes, the lack of training in which caused the harm and injuries to PLAINTIFF, as alleged herein.

702. When engaging in their culpable conduct described herein, DEFENDANTS

sued in this cause of action, and each of them, acted with malice, express or implied, in that DEFENDANTS engaged in despicable conduct by virtue of the egregious nature of their failures to properly train, supervise, and retain the individuals responsible for the safety and rights of PLAINTIFF, and these DEFENDANTS had a conscious disregard of the rights or safety of PLAINTIFF and of vulnerable persons similarly situated to PLAINTIFF.

703. DEFENDANTS exhibited a conscious disregard of PLAINTIFF'S rights and/or safety when they knew of the probably harmful consequences of their wrongful acts of neglecting to properly train, supervise, and retain OFFICERS MILLER, PATTERSON, JONES, and SPARKS POLICE OFFICER DOE 1, DOE CORRECTIONS OFFICER(S) FOR WASHOE COUNTY JAIL, and DOE INDIVIDUALS 6 THROUGH 50, and each of them, the probable harmful consequences of which included physical and mental injury as well as the violation of PLAINTIFF'S rights that DEFENDANTS recklessly, willfully, and/or deliberately failed to act to avoid.

704. DEFENDANTS breached their duty to PLAINTIFF when they allowed OFFICERS MILLER, PATTERSON, JONES, and SPARKS POLICE OFFICER DOE 1, DOE CORRECTIONS OFFICER(S) FOR WASHOE COUNTY JAIL, and DOE INDIVIDUALS 6 THROUGH 50, and each of them, to take adverse action against PLAINTIFF on the basis of profiling bias that targeted PLAINTIFF because of her race, disability, and gender.

705. The hostile and capricious actions of DEFENDANTS' employees directly and proximately caused injury to PLAINTIFF.

706. DEFENDANTS SPARKS POLICE DEPARTMENT, WASHOE COUNTY JAIL, LAS VEGAS METROPOLITAN POLICE DEPARTMENT, and DOE GOVERNMENT ENTITIES 4 through 10 should have known better than to entrust sensitive screening of individuals to police employees who were liable

to treat those individuals as a public threat simply by virtue of their race, disability, and gender.

707. The incompetence of DEFENDANTS' negligently-hired and poorly-trained police employees was both the direct and proximate cause of PLAINTIFF'S injuries.

708. PLAINTIFF has sustained damage including but not limited to: new psychological and physical conditions, moving fees to move both within Reno and from Reno to Las Vegas, embarrassment in front of neighbors and work colleagues, lost work, lost property, damage to her reputation, profiling her for having a disability that is protected by the ADA and Nevada state law, costs associated with having to constantly change telephone numbers, and capricious exclusion from an apartment complex where she had the legal right to be.

709. Accordingly, PLAINTIFF is entitled to recover all available damages, including—but not limited to—punitive damages, if available, as allowed by law, in an amount to be determined at trial.

710. As a further result of the culpable conduct by DEFENDANTS, as alleged in this cause of action, PLAINTIFF has had to retain the services of attorneys in this matter, for which he seeks costs and reasonable attorneys' fees.

## *—REMEDIES COMMON TO ALL CLAIMS—*

## XXXI.

### *Declaratory Relief*

### (Asserted Against ALL DEFENDANTS)

711. PLAINTIFF incorporates by reference all other allegations in this *Complaint*, as though fully set forth herein.

712. Pursuant to NRS 30.030, NRS 30.100, NRS 651.090(2)(a), and the Court's inherent equitable powers, PLAINTIFF seeks, and is entitled to have,

declaratory relief awarded in his favor, to declare her rights and obligations of the DEFENDANTS sued herein, where such declaratory relief is necessary and proper to the termination of the disputes raised herein, including as specifically prayed for below.

713. This includes declaratory relief whereby the Court issues a declaration that DEFENDANTS unlawfully discriminated against, harassed, surveilled, and retaliated against PLAINTIFF and otherwise violated PLAINTIFF'S rights under the law, and any other declaration the Court finds necessary and proper.

**XXXII.**

***Injunctive Relief***

**(Asserted against ALL DEFENDANTS)**

714. PLAINTIFF incorporates by reference all other allegations in this *Complaint*, as though fully set forth herein.

715. Based on the foregoing, PLAINTIFF has suffered an irreparable injury, and the remedies available at law, such as monetary damages, are inadequate to compensate for that injury.

716. PLAINTIFF is entitled to injunctive relief, which would include expunging PLAINTIFF'S criminal record and any other public records related to her in this matter, including her booking photo, and removal of any and all defamatory publications made by SPARKS POLICE DEPARTMENT and/or WASHOE COUNTY JAIL and/or LAS VEGAS METROPOLITAN POLICE DEPARTMENT about PLAINTIFF on third-party websites.

717. Considering the balance of hardships between PLAINTIFF and DEFENDANTS, a remedy in equity is warranted and the public interest will be served by issuance of such injunctive relief.

718. Pursuant to NRS 33.010 *et seq.*, NRS 651.090(2)(a), and the Court's inherent equitable powers, PLAINTIFF is entitled to have injunctive relief awarded in her favor, including by restraining the acts complained of and compelling the obligations of the DEFENDANTS sued herein to give effect to the declaratory and other relief awarded by the Court in this action.

719. Such injunctive relief is necessary and proper to the resolution of the disputes raised herein, including as specifically prayed for below, and any other declarations and equitable relief that the Court deems necessary and proper.

## XXXIII.
## PRAYER FOR RELIEF

WHEREFORE, PLAINTIFF prays for judgment against all DEFENDANTS, jointly and severally, as follows:

1. For general damages in an amount in excess of $250,000.00;
2. For special damages in an amount in excess of $250,000.00;
3. For past and future compensatory damages, and other expenses incurred by reason of DEFENDANTS' intentional misconduct, acts, omissions, carelessness, recklessness, negligence, gross negligence, deliberate indifference, and other culpable conduct, described herein, in an amount in excess of $250,000.00;
4. For punitive and exemplary damages as allowed by law;
5. For costs of the suit incurred herein;
6. For attorneys' fees, costs and prejudgment interest;
7. For declaratory relief, in the form of declarations that:

   (A) PLAINTIFF was battered by DEFENDANT SPARKS POLICE DEPARTMENT and wrongly arrested in violation of her rights under the U.S. Constitution and Nevada state law.

(B) PLAINTIFF was wrongly jailed and wrongly placed in solitary confinement by WASHOE COUNTY JAIL in violation of her rights under the U.S. Constitution and Nevada state law.

(C) PLAINTIFF was discriminated against by DEFENDANT SPARKS POLICE DEPARTMENT, WASHOE COUNTY JAIL, OFFICERS PATTERSON, JONES, MILLER, and SPARKS POLICE OFFICER DOE 1 on the basis of her race, gender, and disability.

(D) PLAINTIFF has been illegally harassed and surveilled by DEFENDANT LAS VEGAS METROPOLITAN POLICE DEPARTMENT working in tandem with DEFENDANT SPARKS POLICE DEPARTMENT.

(E) PLAINTIFF'S current medical damages are the direct and proximate result of the conduct of ALL DEFENDANTS.

Dated this 20th Day of July, 2022.

The Law Offices of Robert S. Melcic

/s/ Robert S. Melcic
ROBERT S. MELCIC
Nevada Bar No. 14923
3315 E. Russell Rd.
Ste. A4-271
Las Vegas, NV 89120
Phone: (702) 526-4235
Clerk: (725) 577-8013
Email: robertmelcic@gmail.com
*Attorney for Plaintiff Allanna Warren*

## CERTIFICATE OF SERVICE

Pursuant to NRCP Rule 5(b)(4), I hereby certify that I am an employee of The Law Office of Robert S. Melcic and that on the 20th day of July, 2022, I caused the foregoing *First Amended Complaint* to be served as follows:

[ ] **BY U.S. MAIL**: By placing a true and correct copy of the same to be deposited for mailing in the U.S. Mail in Las Vegas, Nevada, enclosed in a sealed envelope upon which First-Class postage was fully prepaid to the following address:

[ ] **BY PERSONAL SERVICE**: By hand delivery of the document(s) listed above to the person(s) at the following address:

[ **X** ] **BY ELECTRONIC FILING**: By EFS service pursuant to Rule 5(b)(2)(E) of the NRCP and Rule 9 of the NEFCR.

[ ] **BY ELECTRONIC MAIL**: By e-mail, consented to in writing, pursuant to Rule 5(b)(2)(F) of the NRCP at the following e-mail address:

/s/ Geneviève G. Generaux
An employee of
The Law Office of Robert S. Melcic